Notice: This opinion is subject to formal revision before publication in the Federal Reporter or U.S.App.D.C. Reports. Users are requested to notify the Clerk of any formal errors in order that corrections may be made before the bound volumes go to press.

# United States Court of Appeals

FOR THE DISTRICT OF COLUMBIA CIRCUIT

Argued January 20, 2004        Decided April 9, 2004

No. 03-1062

GENE C. GEIGER,
PETITIONER

v.

SECURITIES AND EXCHANGE COMMISSION,
RESPONDENT

Consolidated with
No. 03-1063

On Petitions for Review of an Order of the
Securities and Exchange Commission

*Jeffrey J. Scott* argued the cause and filed the briefs for petitioner Gene C. Geiger.

Bills of costs must be filed within 14 days after entry of judgment. The court looks with disfavor upon motions to file bills of costs out of time.

*David A. Zisser* argued the cause and filed the briefs for petitioner Charles F. Kirby.

*Randall W. Quinn*, Assistant General Counsel, Securities and Exchange Commission, argued the cause for respondent. With him on the brief were *Giovanni P. Prezioso*, General Counsel, *Meyer Eisenberg*, Deputy General Counsel, *Jacob H. Stillman*, Solicitor, and *Susan K. Straus*, Attorney.

Before: HENDERSON, RANDOLPH, and GARLAND, *Circuit Judges*.

Opinion for the Court filed by *Circuit Judge* RANDOLPH.

RANDOLPH, *Circuit Judge*: As a general rule, issuers of securities must register their securities with the Securities and Exchange Commission before offering or selling them to the public. The Commission, finding that Gene C. Geiger and Charles F. Kirby improperly sold to the public unregistered securities, or participated in such a sale, sanctioned them for violating § 5 of the Securities Act, 15 U.S.C. § 77e(a) & (c).[1] In these petitions for judicial review, Geiger and Kirby claim the transactions were exempt from the registration requirement and that the sanctions the Commission imposed were improper.

## I.

In 1995, Ron Knittle and Mary Erickson were the controlling shareholders and, respectively, the president and CEO, and the secretary and treasurer, of Beneficial Capital Financial Services Corporation, then a shell corporation. That year they changed the corporation's name to Golden Eagle International, Inc. The newly-named company intended to acquire, develop, and operate mines. In three transactions, nearly 3 million unregistered shares of Golden Eagle ended up in the hands of the investing public.

The transactions consisted of three blocks of shares. The first two blocks, totaling 633,000 shares, were nominally held

---

[1] Section 5(a) prohibits selling unregistered securities; § 5(c) prohibits offering to sell or offering to buy unregistered securities.

by Kimi Hunsaker. Knittle and Erickson actually controlled these shares. Hunsaker, a clerical employee of Golden Eagle, never paid for the shares and, at least initially, did not know they were in her name. The certificate representing 500,000 of the Hunsaker shares bore a restrictive legend stating that the shares could not be sold without registration. The certificate representing the remaining 133,000 Hunsaker shares also once bore a restrictive legend, but a new, unrestricted certificate had been issued when Knittle and Erickson acquired the company.

The third block consisted of 2.3 million shares held by David Hills, a former Golden Eagle executive. Hills' severance agreement required him to return 2.1 million of these shares to Golden Eagle once the company satisfied certain obligations. The certificates representing Hills' shares bore restrictive legends.

*A. The Kirby–Hunsaker Transaction*

In June 1995, Knittle approached petitioner Gene C. Geiger, then a salesman at the Colorado-based brokerage firm of Spencer Edwards, Inc. He asked Geiger to find a buyer for the 133,000 Hunsaker shares whose certificate did not have a restrictive legend. Geiger offered the shares to petitioner Charles F. Kirby, the head trader at Spencer Edwards. Kirby agreed to buy the shares for $25,000 for the account of CKC Partners, a partnership jointly owned by Kirby and a trust he administered on behalf of his children. When Kirby sought to pay for the shares, Geiger told him he was "unclear as to who the seller was or who the check was to be made out to." Kirby therefore left the payee's line on his check blank. Geiger later filled in the line, making the check payable to Erickson. In short order, Kirby resold the shares to the public for $56,000.

That the shares Kirby sold were unregistered did not necessarily render the transaction unlawful. The Securities Act focuses primarily on initial offerings, rather than on secondary transactions among members of the public. *See* 1 THOMAS LEE HAZEN, THE LAW OF SECURITIES REGULATION § 1.1 (4th ed. 2002); *Blue Chip Stamps v. Manor Drug Stores*, 421

U.S. 723, 752 (1975). Section 4(1) of the Act thus exempts from registration "transactions by any person other than an issuer, underwriter, or dealer." 15 U.S.C. § 77d(1). The exemption did not apply, the Commission decided, because Kirby was an "underwriter." Kirby had the burden of proving otherwise. *SEC v. Ralston Purina*, 346 U.S. 119, 126 (1953).

Section 2(11) of the Act defines "underwriter" as "any person who has purchased from an issuer with a view to, or offers or sells for an issuer in connection with, the distribution of any security, or participates . . . in any such undertaking[.]" 15 U.S.C. § 77b(11). The term "issuer" includes not only the issuing company, but also "any person directly or indirectly controlling or controlled by the issuer." *Id.* The statute does not define "distribution."

Kirby purchased the shares from a "person . . . controlling . . . the issuer," and he intended to sell those shares to the public, as he did. His argument is that he was not an "underwriter" excluded from the § 4(1) exemption because his sale was not a "distribution" within the meaning of § 2(11). The sale was not a "distribution," he claims, because he sold only 0.5 percent of Golden Eagle's more than 12 million shares. According to Kirby, a sale qualifies as a "distribution" only if it involves a "substantial" or "significant" percentage of the issuer's outstanding shares.

Registration of securities protects "investors by promoting full disclosure of information thought necessary to informed investment decisions." *Ralston Purina*, 346 U.S. at 124. To the purchaser of securities, the potential loss – and the need for disclosure – is the same regardless whether the securities represent one percent, five percent, or ten percent of the outstanding shares. The applicability of the § 4(1) exemption turns not on the percentage of shares involved, but "on whether the particular class of persons affected need the protection of the Act." *Id.* at 125. In *Ralston Purina*, the Supreme Court relied on this reasoning to reject the notion that the term "public offering," as used in another exemption to the registration requirement, 15 U.S.C. § 77d(2), contem-

plated any particular quantity of stock. The same reasoning applies to "distributions" under § 2(11). Every court to consider this question has so ruled. *Ackerberg v. Johnson*, 892 F.2d 1328, 1337 (8th Cir. 1989); *SEC v. Dolnick*, 501 F.2d 1279, 1282 (7th Cir. 1974); *Quinn & Co. v. SEC*, 452 F.2d 943, 946 (10th Cir. 1971); *Gilligan, Will & Co. v. SEC*, 267 F.2d 461, 467 (2d Cir. 1959).

In arguing to the contrary, Kirby cites two opinions supposedly supporting the idea that distributions must involve a substantial percentage of the outstanding shares. The first case, *Pennaluna & Co. v. SEC*, 410 F.2d 861, 865 (9th Cir. 1969), actually hurts rather than helps him. The *Pennaluna* court upheld the Commission's finding of a § 5 violation on the basis of sales that amounted to a mere 0.25 percent of the outstanding shares. 410 F.2d at 865, 867–68. The second opinion, *SEC v. American Beryllium & Oil Corp.*, 303 F. Supp. 912 (S.D.N.Y. 1969), discussed the meaning of a regulation, not the term "distribution" in § 2(11). 303 F. Supp. at 915 n.3.

Kirby's alternative argument is that even if the sale violated § 5(a) of the Act, he did not violate § 5(c), which makes it "unlawful for any person . . . to offer to sell . . . any [unregistered] security[.]" 15 U.S.C. § 77e(c). According to Kirby, he did not "offer" to sell the 133,000 Hunsaker shares, but merely accepted outstanding offers from market makers to buy Golden Eagle shares at a particular price.[2] The argument fails under common law: price quotations are "commonly understood as inviting an offer rather than making one[.]" Restatement (Second) of Contracts § 26 cmt. c (1981). It fails as well under the Securities Act, which is what governed the legality of Kirby's conduct. As used in § 5, "the term 'offer to sell' . . . shall include every attempt or offer to dispose of, or solicitation of an offer to buy, a security or interest in a security, for value." 15 U.S.C. § 77b(3). There

---

[2] A market maker continuously stands ready to buy or sell particular stocks at particular prices. *See* 2 The New Palgrave Dictionary of Money & Finance (Peter Newman et al. eds., 1992).

is no doubt that Kirby's sale of the shares constituted an "attempt . . . to dispose" of them.

Substantial evidence supports the Commission's finding that Kirby's conduct was willful. True, there is no evidence Kirby actually knew the shares were controlled by a statutory issuer. The share certificate bore no restrictive legend, and Geiger assured Kirby that the shares were "free-trading." Kirby's problem is that he failed to inquire sufficiently into the circumstances of the transaction. *Wonsover v. SEC*, 205 F.3d 408, 415 (D.C. Cir. 2001) (citing *Distribution by Broker–Dealers of Unregistered Securities*, Securities Act Rel. No. 4445, 1962 WL 69442 (Feb. 2, 1962)). "[W]hen a dealer is offered a substantial block of a little-known security, either by persons who appear reluctant to disclose exactly where the securities came from, or where the surrounding circumstances raise a question . . . whether or not the ostensible sellers may be merely intermediaries for controlling persons or statutory underwriters, then searching inquiry is called for." *Id.* Even if, as Kirby argues, this sale was not substantial, all the other warning signs were present. Golden Eagle was little-known and lightly traded, and Geiger was reluctant to disclose the true party in interest. If Kirby had simply insisted on knowing the identity of the seller, he would have uncovered the illegal nature of the transaction. By giving Geiger a blank check, Kirby abandoned even the pretense of due diligence.

*B.   The LaSalle–Hunsaker Transaction*

In December 1995, Knittle approached Geiger again, hoping to dispose of the remaining 500,000 Hunsaker shares. Geiger offered the shares to his client Alfred Peeper. Peeper agreed to buy the stock on behalf of LaSalle Investment Ltd., an Irish corporation whose trading he controlled. The terms of the deal were extremely favorable to LaSalle: it would buy the shares at a substantial discount, even less than the partnership – CKC – had paid. Geiger negotiated the terms directly with Knittle before speaking to Hunsaker.

The certificate for these shares still bore a restrictive legend. Commission Rule 144 allows persons affiliated with

an issuer to sell unregistered securities without being deemed underwriters if they meet certain conditions. *See* 17 C.F.R. § 230.144. Among the conditions is a minimum holding period between the time the "affiliate" acquired the securities and the time of the sale. 17 C.F.R. § 230.144(d). Geiger and his partner Thomas Kaufmann submitted documents asking the transfer agent[3] to issue a new, unrestricted certificate pursuant to Rule 144 on the basis that Hunsaker satisfied the holding period requirement. Although the shares had been in her name for less than the required period, her holding period could "tack" onto the holding periods of the previous "owners" (whom Knittle and Erickson also controlled).

When Geiger contacted Hunsaker, she told him she had never paid for the securities. This made the shares ineligible for the Rule 144 exemption. Geiger confronted Knittle with the information. Knittle did not deny Hunsaker's assertion. Instead, he instructed Geiger to withhold payment until the matter was resolved. Nevertheless, a new, unrestricted share certificate was deposited in LaSalle's Spencer Edwards account. LaSalle later sold the shares at a substantial profit.

The Commission found that Geiger violated § 5 by participating in the distribution of the 500,000 Hunsaker shares. Geiger argues that he is not liable for the sale because he relied on the transfer agent's determination that the shares were unrestricted. The Commission called this argument "disingenuous." It was generous. The transfer agent relied on false documentation. Even if Kaufmann alone prepared the documents, as Geiger claims, Geiger knew that Hunsaker had not paid for the shares and thus did not qualify for the Rule 144 exemption. In addition, Geiger – having negotiated the entire transaction directly with Knittle – knew that Hunsaker was not the real party in interest.

---

[3] A transfer agent is "responsible for recording changes of ownership of securities, canceling obsolete certificates, and issuing new ones." THE RANDOM HOUSE DICTIONARY OF BUSINESS TERMS 286 (Jay N. Nisberg ed., 1988).

## C. *The LaSalle–Hills Transaction*

About the same time as the last Hunsaker transaction, Knittle and Hills separately approached Geiger to find a buyer for the Hills shares. Geiger told Hills that before he arranged the transaction, he would have to "work out some details" with Knittle. Knittle urged Geiger to find a buyer for the Hills stock. Geiger then informed Hills that LaSalle would buy 666,000 of his shares for $156,000. But when Hills delivered his certificate, Geiger told him Knittle had changed the terms of the deal. Hills would now have to deliver all 2.3 million shares in exchange for $119,000. Hills agreed, and the parties executed the sale on Knittle's terms. Although the sale closed on February 1, 1996, Geiger gave Hills a check dated November 4, 1995. When Hills questioned the date, Geiger assured him the check would clear. It did.

The certificates Hills delivered bore restrictive legends. Geiger had asked an attorney to write an opinion letter for the transfer agent stating that the restrictions could be removed pursuant to the Commission's Regulation S. Regulation S permits the sale of unregistered securities in certain off-shore transactions, including sales to a "non-U.S. person" such as LaSalle. 17 C.F.R. §§ 230.901–904. At the time, the regulation forbade the foreign buyer from reselling the shares within the United States for 40 days. 17 C.F.R. § 230.903(c)(2)(iii) (1995). The attorney's letter, dated February 5, 1996, stated that the parties to the transaction certified that the sale closed "on or about November 10, 1995." Based on that representation, the attorney concluded that the restricted period ended – and new, unrestricted certificates could issue – on or about December 20, 1995. New certificates issued, and LaSalle sold the shares at a substantial profit.

As noted above, the sale actually closed on February 1, 1996. The attorney testified that Geiger was the one who told him otherwise.

The Commission found that Geiger violated § 5 by participating in the sale of the Hills shares. Geiger's first defense is that Hills was no longer affiliated with Golden Eagle at the

time of the sale and, therefore, the transaction was within the § 4(1) exemption for sales "by a person other than an issuer, underwriter, or dealer." The Commission rejected this defense on the ground that Knittle, a statutory issuer, actually controlled the transaction. Substantial evidence supports this finding. Geiger would not have proceeded with the sale without Knittle's permission, and Hills allowed Knittle to dictate the terms of the deal. Just as important, the transaction primarily benefitted Golden Eagle. The company had already committed to repurchase Hills' shares in fulfillment of its obligations under his severance agreement. Hills was determined to sell his shares because it appeared Golden Eagle might default on that agreement. Knittle feared the sale would "crumble the market" in Golden Eagle stock. The transaction with LaSalle alleviated Knittle's fear and relieved the company of some of its contractual obligations. Thus, functionally, this transaction was a public offering by Golden Eagle to retire its debt to Hills.

Geiger objects that even if Knittle and Golden Eagle were the real sellers, he is not liable because he did not participate in LaSalle's ultimate sale of the shares to the public. Geiger's premise is faulty. He did not have to be involved in the final step of the distribution to have participated in it. "The term 'distribution' refers to the entire process in a public offering through which a block of securities is dispersed and ultimately comes to rest in the hand of the investing public." *In re Wonsover*, Exchange Act Release No. 41123, 1999 WL 100935 at *7 n.25 (Mar. 1, 1999), *aff'd,* 205 F.3d 408 (D.C. Cir. 2000). *See also Ackerberg v. Johnson*, 892 F.2d 1328, 1335–36 (8th Cir. 1989) (Congress intended "to cover all persons who might operate as conduits for the transfer of securities to the public") (citing 1 HAZEN, THE LAW OF SECURITIES REGULATION at § 4.24). It is true that "not everyone in the chain of intermediaries between a seller of securities and the ultimate buyer is sufficiently involved in the process to make him responsible for an unlawful distribution[.]" *Owen v. Kane*, Securities Act Release No. 23827, 1986 WL 626043 at *3 (Nov. 20, 1986). But someone who played a role as crucial as Geiger's – finding the buyer, negotiating the terms, facilitating the resale – cannot escape liability by avoiding direct involvement

in the final act. In any event, the evidence shows that Geiger did participate in LaSalle's resales. LaSalle could not resell the shares back into the United States without new, unrestricted certificates. It was Geiger who procured those certificates by fraudulently obtaining the attorney's opinion letter.

For the first time in his reply brief, Geiger argues that *Pinter v. Dahl*, 486 U.S. 622 (1988), imposes additional requirements for § 5 liability. According to Geiger, *Pinter* holds that he can be liable under § 5 only if he solicited a buyer for LaSalle's shares and received compensation for the sale. We do not believe *Pinter* is on point, but even if it were, Geiger waived the argument by failing to raise it before the Commission and in his opening brief. *See* 15 U.S.C. § 78y(c)(1); *Rollins Envtl. Servs. (NJ), Inc. v. EPA*, 937 F.2d 649, 653 n.2 (D.C. Cir. 1991).

Geiger further argues that he should not be liable because LaSalle did not actually sell the Hills shares until after the restricted period had expired. The Commission disputes this claim, arguing the sales occurred within the 40 days. We need not resolve the issue. The Regulation S exemption does not apply to transactions that, though in technical compliance, are designed to evade the registration requirement. *Offshore Offers and Sales*, Securities Act Release No. 6863, 1990 WL 311658 at *25 (Apr. 24, 1990). The Commission had good reason to conclude that the sale of the Hills shares was such a transaction. At the time, Peeper was not interested in holding Golden Eagle stock. He bought the shares for LaSalle at a substantial discount and quickly resold them for a profit. Geiger was so anxious to facilitate this quick resale that he resorted to fraud. Peeper funneled much of LaSalle's trading profit back to Golden Eagle by buying Golden Eagle debentures and restricted stock. This evidence supports the Commission's finding that the shares were never meant to "come to rest abroad."

## II.

The Commission barred Kirby and Geiger from associating with any broker or dealer or participating in any penny stock

offering, with the right to reapply in five years. It ordered Kirby to disgorge $31,352.60 in illegal profits and pay a $200,000 civil penalty. It ordered Geiger to disgorge $15,202.48 and pay a civil penalty of $300,000. It also ordered both men to cease and desist from committing any § 5 violations.

Kirby and Geiger complain that the sanctions are excessive compared to other cases. *See In re Wonsover*, Exchange Act Release No. 41123, 1999 WL 100935 (Mar. 1, 1999), *aff'd*, 205 F.3d 408 (D.C. Cir. 2000); *In re Steen*, Exchange Act Release No. 40055, 1998 WL 278994 (June 2, 1998); *In re Leigh*, Exchange Act Release No. 27667, 1990 WL 1104369 (Feb. 1, 1990). The Commission is not obligated to make its sanctions uniform, so we will not compare this sanction to those imposed in previous cases. *Butz v. Glover Livestock Comm'n Co.*, 411 U.S. 182, 186–87 (1973). We must uphold the sanction unless it is "unwarranted in law or . . . without justification in fact . . . [.]" *Id*. at 185–86 (quoting *American Power Co. v. SEC*, 329 U.S. 90, 112 (1946)). The sanctions here satisfy that standard. Geiger's conduct was, as the Commission put it, egregious. It involved intentional misrepresentation and falsification of documents, and led to the distribution of hundreds of thousands of unregistered securities. While Kirby's conduct was not as bad, he ignored obvious warning signs that the transaction was illegal. He also has a disciplinary history, having twice been sanctioned by the National Association of Securities Dealers.[4]

Both petitioners also challenge the disgorgement order, claiming they did not profit from their respective transactions. Kirby argues that he and CKC Partnership are legally separate, and that the Commission should not have attributed CKC's profit to him. The evidence is otherwise. The administrative law judge found, and the Commission agreed, that Kirby and CKC were "one and the same." Kirby was part-owner of CKC and had total control over its account. The

---

[4] Kirby objects to the consideration of his disciplinary history, but he did not raise this objection before the Commission. *See* 15 U.S.C. § 78y(c)(1).

other owner, CKC Family Trust, was a trust Kirby administered on behalf of his children. Kirby produced no evidence to support his claim of legal separateness. He submitted no documents showing how CKC was organized or managed, and could not even say whether the CKC Family Trust was irrevocable. For his part, Geiger argues there is no evidence he ever received commissions from LaSalle's sale of the Golden Eagle stock. LaSalle's Spencer Edwards account lists a total of $62,889.45 under a column labeled "Commissions." The reasonable inference is that this represented commissions LaSalle paid Spencer Edwards. Geiger's employment arrangement entitled him to 25% of those commissions. He offers no reason to think his compensation for those trades did not conform to the usual arrangement.

Kirby also objects to the cease-and-desist order. He argues that his violation resulted from an unusual convergence of factors, and there is no indication he is likely to repeat it. But under Commission precedent, the existence of a violation raises an inference that it will be repeated. *See In re Trento*, Securities Act Release No. 8391, 2004 WL 329040 at *3 (Feb. 23, 2004); *In re Richmark Capital Corp.*, Securities Act Release No. 8333, 2003 WL 22570712 at *10 (Nov. 7, 2003). The Commission reasonably found Kirby's conduct "egregious," which justifies the inference in this case. *See KMPG v. SEC*, 289 F.3d 109, 125–26 (D.C. Cir. 2002). Kirby does little to dispel it. As the Commission noted, Kirby still thinks he did nothing wrong, which casts doubts on his promise that he will mend his ways. Kirby replies that *SEC v. First City Financial Corp.*, 890 F.2d 1215 (D.C. Cir. 1989), forbids the Commission from considering his lack of remorse. The case stands for no such proposition. The majority of the panel in *First City* sustained the Commission's position. *Id.* at 1233 (Ruth Bader Ginsburg & Edwards, JJ., concurring). In short, the Commission's decision to impose a cease-and-desist order was warranted.

* * *

The Commission properly found that Kirby and Geiger violated § 5 of the Securities Act, and the sanctions it im-

posed were appropriate.[5]   The petitions for review are denied.

*So ordered.*

---

[5] Kirby complains that the Commission did not dispose of his case within a reasonable time.   That claim is moot.   *See Sierra Club v. Thomas,* 828 F.2d 783, 795 n.81 (D.C. Cir. 1987).   Geiger argues that he did not act "wilfully" because Spencer Edwards' president and compliance officer approved the transactions.   We do not see how this proves that Geiger did not have the state of mind required to violate § 5.   *See Wonsover*, 205 F.3d at 413–15.   Still less can we see how it would lead to a conclusion that the Commission's findings lack sufficient evidentiary support.