**FOR PUBLICATION**

# UNITED STATES COURT OF APPEALS
# FOR THE NINTH CIRCUIT

| | |
|---|---|
| WORLD TRADE FINANCIAL CORPORATION; JASON TROY ADAMS; FRANK EDWARD BRICKELL; RODNEY PRESTON MICHEL, *Petitioners*, <br><br> v. <br><br> U.S. SECURITIES & EXCHANGE COMMISSION, *Respondent*. | No. 12-70681 <br><br><br> OPINION |

On Petition for Review of an Order of the
Securities and Exchange Commission

Argued and Submitted
November 7, 2013—Pasadena, California

Filed January 16, 2014

Before: M. Margaret McKeown, Ronald M. Gould,
and Jay S. Bybee, Circuit Judges.

Opinion by Judge Gould

## SUMMARY[*]

### Securities / Fines and Sanctions

The panel denied a petition for review of the Securities and Exchange Commission's Order upholding a variety of fines and sanctions against petitioners for violating Sections 5(a) and 5(c) of the Securities Act of 1933, which prohibit the sale or offer of a security without filing a registration statement.

The panel held that substantial evidence supported the Commission's finding that petitioners violated Sections 5(a) and 5(c) of the 1933 Securities Act. The panel also held that petitioners did not meet their duty of inquiry necessary to claim the Section 4(4) brokers' exemption. The panel deferred to the Commission's discretionary determination as to the appropriate fines and sanctions because they were within the Financial Industry Regulatory Authority's guidelines and were supported by the evidence in the record.

### COUNSEL

John Courtade (argued), Law Office of John Courtade, Austin, Texas; Irving M. Einhorn, Law Offices of Irving M. Einhorn, Manhattan Beach, California, for Petitioners.

---

[*] This summary constitutes no part of the opinion of the court. It has been prepared by court staff for the convenience of the reader.

Catherine A. Broderick (argued) and Jacob H. Stillman, Securities and Exchange Commission, Washington, D.C., for Respondent.

## OPINION

GOULD, Circuit Judge:

World Trade Financial Corporation ("World Trade"), Jason T. Adams, Frank E. Brickell, and Rodney P. Michel (collectively, "Petitioners") petition for review of the Security and Exchange Commission's ("Commission") Order Sustaining Disciplinary Action Taken by FINRA (the Financial Industry Regulatory Authority), which upheld a variety of fines and sanctions against Petitioners for their violations of Sections 5(a) and 5(c) of the Securities Act of 1933, 15 U.S.C. §§ 77e(a), 77e(c) ("1933 Securities Act"), which prohibit the sale or offer of sale of a security without filing a registration statement, *id*. In its opinion, the Commission found that Petitioners had traded unregistered securities and that the Section 4(4) "brokers' exemption" of the 1933 Securities Act, which exempts "brokers' transactions executed upon customers' orders" from liability under Sections 5(a) and 5(c), was unavailable to Petitioners because they had not met their duty of inquiry given the presence of many suspicious circumstances surrounding the sales. The Commission also upheld the fines and sanctions imposed by FINRA and the National Adjudicatory Council ("NAC") for these Section 5 violations as well as for supervisory failures that violated the National Association of Securities Dealers ("NASD") Conduct Rules 2110 and 3010 establishing standards of supervision for registered representatives, principals, and other individuals associated

with covered transactions. Petitioners urge us to reverse and dismiss the Commission's order, or alternatively, to vacate the fines and sanctions and remand the case.

We conclude that substantial evidence supports the Commission's finding that Petitioners violated Sections 5(a) and 5(c) of the 1933 Securities Act, and we hold that Petitioners did not meet their duty of inquiry necessary to claim the Section 4(4) brokers' exemption. We defer to the Commission's discretionary determination as to the appropriate fines and sanctions because they are within FINRA's guidelines and are supported by evidence in the record. Accordingly, we deny the petition for review.

## I.

World Trade, a broker-dealer registered with the SEC, has been a member of FINRA since 1998, and Petitioners Michel and Adams were its principals and owners at the relevant times. Michel and Adams shared responsibility for supervising the firm's brokers and trading activity. Michel had responsibility for establishing supervisory systems and overall compliance. Adams handled client accounts, performed trading operations, and reviewed trade tickets; he reported to Michel. Petitioner Brickell joined World Trade in 2001 as a General Securities Representative and now serves as a principal at the firm and as its Chief Compliance Officer.

The World Trade Supervisory Manual listed written procedures for the sale of "restricted" stock, or "144 Stock," which included unregistered stock that could be traded under the nonexclusive safe harbor provided in Rule 144 of the

1933 Securities Act.[1]  Those procedures included a list of conditions that a representative was required to meet before selling such securities, including obtaining current information on the company and the terms under which such stock should be sold.  In practice, World Trade's employees identified restricted stock by checking whether the stock certificate deposited by the customer bore a restrictive legend.[2]  The only process in place for handling stock that lacked a restrictive legend was to submit that stock to a clearing firm to be cleared, transferred, and sold.

The history of the shares at issue here, however, show the ease with which restrictive legends may be improperly removed.  Camryn Information Services, Inc. ("Camryn") was incorporated as a shell company in 1997.  Camryn conducted no business, and in November 2004, it entered into a reverse merger with iStorage, a development-stage company in operation since May 2004 that had little operating history, no earnings, and was operating at a net loss of $205,000.

At the time of the merger, iStorage had only four shareholders, all of whom had been shareholders of Camryn. Three of those shareholders each owned 12.5% of the outstanding shares—1,000,000 shares each.  At their request,

---

[1] "Restricted stock" is defined as "[s]ecurities acquired directly or indirectly from the issuer, or from an affiliate of the issuer, in a transaction or chain of transactions not involving any public offering."  17 C.F.R. § 230.144(a)(3)(i) (2012).

[2] A "restrictive legend" is a statement placed on the certificate of a restricted stock used to notify the holder of the stock that it may not be resold without registration. *Geiger v. SEC*, 363 F.3d 481, 483 (D.C. Cir. 2004).

the law firm representing the shareholders issued an opinion letter incorrectly stating that their shares need not bear restrictive legends because: (1) the shareholders had held them for more than two years; (2) none of the shareholders had been an officer, director or 10% shareholder of the company for the previous three months; and (3) that the shareholders were not "affiliates" of Camryn under Securities Act Rule 144(k). The law firm's opinion letter was clearly incorrect because the 12.5% shareholders had held their shares within the previous three months. Regardless, a transfer agent removed the restrictive legends from those Camryn stock certificates, which were later converted into unlegended iStorage stock certificates during the reissuance. On November 3, 2004, iStorage issued a forward stock split for the 12.5% shareholders and canceled the remaining shares, leaving those three shareholders with 5.2 million shares represented by unlegended certificates, which they distributed to a variety of individuals and entities including stock promoters and marketers.

Those shareholders paid three stock promoters, Robert Koch, his sister Kimberly Koch, and Anthony Caridi, in iStorage stock for their work promoting the stock. Robert Koch opened an account with World Trade in August 2004, Anthony Caridi did so in November 2004, and Kimberly Koch opened her account in December 2004. Between December 20, 2004 and March 24, 2005, World Trade sold more than 2.3 million shares of iStorage stock to the public on behalf of these three customers. The Kochs and Caridi instructed Brickell to wire the proceeds quickly, and he accordingly wired the $295,000 profit shortly after the transactions cleared. Brickell earned approximately $9,270 in commissions on the sales. Believing that his inquiry responsibilities were limited to questioning the transfer agent

regarding restrictions, Brickell acknowledged that he made no inquiry into the status or origins of the shares, despite the presence of several "red flags," including that: (1) iStorage was a little-known development stage issuer that had a very short operating history; (2) the company had recently undergone a reverse merger, forward stock split, and name change; (3) the stock was thinly traded in the over-the-counter market; and (4) iStorage had just begun trading shortly before the initiation of trading by the Kochs and Caridi. Most of this information was publicly available on the Pink Sheets stock trading website, and Brickell additionally knew that the Kochs and Caridi received stock as compensation for advertising services.

Michel and Adams also both believed that the transfer agent was responsible for investigating the status of unlegended stock, asserting that "the regulatory scheme places this responsibility squarely on the shoulders of the transfer agent and the issuer and its counsel." Petitioners also admitted, however, that neither the transfer agent nor the clearing firm considered itself responsible for conducting any inquiry on behalf of World Trade.

The Commission affirmed the conclusions of FINRA and the NAC that Petitioners violated section 5(a) and 5(c) of the 1933 Securities Act, as well as NASD Rules 2110 and 3010. The Commission also affirmed the fines and sanctions imposed on Petitioners for those violations.

## II.

We review the Commission's findings of fact for substantial evidence. *Steadman v. SEC*, 450 U.S. 91, 96 n.12 (1981). And while we review the Commission's conclusions

of law de novo, *Gebhart v. SEC*, 595 F.3d 1034, 1040 (9th Cir. 2010), its findings of fact and law are only to be set aside when "arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law." 5 U.S.C. § 706(2)(A); *Ponce v. SEC*, 345 F.3d 722, 728 (9th Cir. 2003). Sanctions are reviewed for an abuse of discretion, *Vernazza v. SEC*, 327 F.3d 851, 858, *amended by* 335 F.3d 1096 (9th Cir. 2003), and should not be overturned unless "unwarranted in law or . . . without justification in fact," *American Power & Light Co. v. SEC*, 329 U.S. 90, 112–14 (1946).

Petitioners argue that the brokers' exemption applies to the transactions at issue and urge us to conclude that the exemption does not require reasonable inquiry. They argue that the supporting cases cited by the SEC stand for the proposition that the SEC carries the burden of showing that the Section 4(4) exemption was vitiated because of the presence of a statutory underwriter. However, this interpretation is contrary to established law. Public policy strongly supports registration and the 1933 Securities Act is designed "to protect investors by promoting full disclosure of information thought necessary to informed investment decisions." *SEC v. Ralston Purina Co.*, 346 U.S. 119, 124 (1953). Because registration is so important to the protection of the investing public, exemptions to registration requirements are construed narrowly against the parties claiming their benefits. *SEC v. Platforms Wireless Int'l Corp.*, 617 F.3d 1072, 1086 (9th Cir. 2010). It is clear that once FINRA established a prima facie case that the trades at issue violated the Section 5 registration requirements, the burden shifted to Petitioners to show the applicability of the Section 4(4) brokers' exemption. *Id.*; *SEC v. Murphy*, 626 F.2d 633, 641 (9th Cir. 1980).

The Commission takes the position and the D.C. Circuit has held that a broker must conduct a "reasonable inquiry" to claim the Section 4(4) exemption for trades that violate Section 5. The D.C. Circuit has concluded that a broker may claim the Section 4(4) exemption if the broker "[a]fter *reasonable inquiry* is not aware of circumstances indicating that the person for whose account the securities are sold is an underwriter with respect to the securities or that the transaction is a part of a distribution of securities of the issuer." *Wonsover*, 205 F.3d at 415 (quoting 17 C.F.R. § 230.144) (emphasis added). We agree with the Commission and the D.C. Circuit that a broker is not merely an "order taker," and must conduct a reasonable inquiry into the circumstances surrounding the transaction before the broker may claim the protection of the Section 4(4) brokers' exemption. *See, e.g.*, *Robert G. Leigh*, Exchange Act Release No. 27667, 1990 WL 1104369, at *4 (Feb. 1, 1990). The broker's reasonable inquiry is important because "violations of the antifraud and other provisions of the securities laws frequently depend for their consummation . . . on the activities of broker-dealers who fail to make diligent inquiry to obtain sufficient information to justify their activity in the security." *Laser Arms Corp.*, Exchange Act Release No. 28878, 1991 WL 292009, at *14 n.35 (Feb. 14, 1991) (quoting *Alessandrini & Co., Inc.*, Exchange Act Release No. 10466, 1973 WL 149302, at *6 (Oct. 31, 1973), *aff'd without opinion sub nom. Budin v. SEC*, 508 F.2d 836 (2d Cir. 1974)).

The extent of the inquiry required for any given trade will vary with the circumstances. The D.C. Circuit correctly explained that:

> An oft-quoted paragraph of a Commission
> release clarifies when a broker's inquiry can

be considered reasonable: "The amount of inquiry called for necessarily varies with the circumstances of particular cases. A dealer who is offered a modest amount of a widely traded security by a responsible customer, whose lack of relationship to the issuer is well known to [the dealer], may ordinarily proceed with considerable confidence. On the other hand, when a dealer is offered a substantial block of a little-known security, either by persons who appear reluctant to disclose exactly where the securities came from, or where the surrounding circumstances raise a question as to whether or not the ostensible sellers may be merely intermediaries for controlling persons or statutory underwriters, then searching inquiry is called for."

*Wonsover*, 205 F.3d at 415 (quoting *Distribution by Broker-Dealers of Unregistered Securities*, Exchange Act Release No. 33-4445, 1962 WL 69442, at *2 (Feb. 2, 1962)). As described above, in many cases that duty may be easily satisfied. But where, as here, there are numerous red flags indicating suspicious circumstances, a more searching inquiry is required. *See Wonsover*, 205 F.3d at 415 (requiring a "searching inquiry" where unfamiliar shareholders offered the broker "a substantial block of little-known and thinly traded security" under questionable circumstances). Petitioners did not inquire into the origins of the iStorage stock despite the significant red flags that we have identified. The circumstances called for a more diligent inquiry, and Petitioners did not satisfy their duty.

Petitioners contend that, to the extent that they had a duty of reasonable inquiry, that duty was met by their reliance on third-parties in conformity with industry practice. We reject this argument for several reasons. First, substantial evidence supports the Commission's conclusion that Petitioners did not establish an industry standard of reliance on third-parties to meet the duty of reasonable inquiry. The Commission was within its discretion to find unreliable the testimonial evidence of interested parties, particularly when the only non-interested witness, a FINRA examiner, testified that he could not confirm such a custom and practice in the industry. And any alleged lack of FINRA enforcement is discredited by the frequency of Commission cases and releases reiterating the broker's duty of reasonable inquiry. *See, e.g.*, *Geiger v. SEC*, 363 F.3d 481, 485 (D.C. Cir. 2004) (finding suspicious circumstances giving rise to a need for heightened inquiry); *Laser Arms Corp.*, Exchange Act Release No. 28878, 1991 WL 292009, at *14 n.35 (Feb. 14, 1991); *Robert G. Leigh*, Exchange Act Release No. 27667, 1990 WL 1104369 (Feb. 1, 1990) ("A broker relying on Section 4(4) cannot merely act as an order taker, but must make whatever inquiries are necessary under the circumstances to determine that the transaction is . . . not part of an unlawful distribution."); *Owen v. Kane*, Exchange Act Release No. 23827, 1986 WL 626043, at *4 (Nov. 20, 1986) (finding that the broker had "no reasonable basis" for believing a stock was exempt from registration without making an investigation); *Evans & Co.*, Exchange Act Release No. 21696, 1985 WL 548642, at *5–6 (Jan. 30, 1986) ("A broker-dealer . . . relying on Section 4(4) cannot act as a mere order-taker. It must make whatever inquiries are necessary under the circumstances to ensure that its customer is not an underwriter.").

Second, even if such an industry practice exists, it would only be suggestive of reasonableness and would not absolve Petitioners of liability under federal securities laws. *See SEC v. Dain Rauscher, Inc.*, 254 F.3d 852, 857 (9th Cir. 2001) (noting the dangers of a "'race to the bottom' to set the least demanding standard to assess . . . conduct."). Third, brokers rely on third-parties at their own peril, and will not avoid liability through that reliance when the duty of reasonable inquiry rests with the brokers. *Wonsover*, 205 F.3d at 415–16 ("If a broker relies on others to make the inquiry called for in any particular circumstances, it does so at its peril."); *Stead v. SEC*, 444 F.2d 713, 716 (10th Cir. 1971) ("[C]alling the transfer agent is obviously not a sufficient inquiry."). Substantial evidence supports the Commission's finding that Petitioners did not prove the existence of such an industry practice in this case. And even if they had, an industry practice of relying on third-parties would not necessarily satisfy a broker's duty of reasonable inquiry merely because the practice was customary.

Petitioners further contend that the Commission erred when it found Petitioners' supervisory system to be inadequate. They assert that FINRA's lack of enforcement and the industry standard practice show that the supervisory system was reasonable. We reject these arguments.

NASD Rule 3010 requires member firms to establish, maintain, implement, and enforce supervisory systems that are tailored to their businesses and that are reasonably designed to achieve compliance with securities laws and regulations, as well as NASD Rules. NASD Rule 3010(a)–(b). We have no doubt that Petitioners' supervisory system was inadequate to detect unlawful distributions. World Trade's written procedures required no inquiry at all

by staff who were confronted with unlegended securities. The facts of this case illustrate why both courts and the Commission have cautioned against relying on the presence, or lack thereof, of restrictive legends. *See Quinn & Co. v. SEC*, 452 F.2d 943, 947 (10th Cir. 1971) ("[Petitioners] were not entitled to rely on the lack of cautionary legends on the stock certificates. Brokers and securities salesmen are under a duty to investigate.").

Rather than relying exclusively on the presence or absence of restrictive legends, procedures must "be sufficient to reveal promptly to supervisory officials transactions which may, when examined individually or in the aggregate, indicate that sales in a security should be halted immediately." *Sales of Unregistered Securities by Broker-Dealers*, Exchange Act Release No. 9239, 1971 WL 127558, at *2 (July 7, 1971). Here, the same red flags that heightened Brickell's duty to investigate similarly should have prompted both Michel and Adams to investigate the trades, but neither supervisor conducted any inquiry into the sales. In stark contrast to what we hold to be their supervisory duty, Michel and Adams both admitted that they believed they had no independent responsibility to investigate any unlegended shares or trades. That other firms may have had similar practices does not excuse ignorance of the law, and Petitioners' supervisory system clearly fell short of the required standard.

## III.

Petitioners' argument that the Commission's sanctions are excessive and punitive also fails. The Commission has substantial discretion in deciding sanctions and fines, and we conclude that it did not abuse its discretion in this case. *See*

*Vernazza*, 327 F.3d at 858. The sanctions were in the mid-range of FINRA's sanction guidelines, and evidence supports the conclusion of FINRA, the NAC, and the Commission that Petitioners' violations were egregious because Petitioners made no reasonable efforts to carry out their legal duties. Petitioners' assertion that they were following industry practice does not relieve them of these duties. *See O'Leary v. SEC*, 424 F.2d 908, 912 (D.C. Cir. 1970) ("[A]s to petitioners' protest that they 'were first offenders,' acting in accord with advice of counsel, and causing no injury to the investing public, we concur with Chief Judge Lumbard's statement in *Tager v. SEC*, 344 F.2d 5, 8 (2d Cir. 1965): 'While these factors might have warranted a lighter sanction, they did not require one.'").

We conclude that Petitioners violated Sections 5(a) and 5(c) of the 1933 Securities Act and that they may not claim the Section 4(4) brokers' exemption because they did not meet their duty of reasonable inquiry. The Commission did not abuse its discretion in upholding the sanctions imposed by FINRA and the NAC. These sanctions were reasonable and commensurate with petitioners' serious and several breaches of the duties they owed to the investing public.

**DENIED.**