FOR PUBLICATION

# UNITED STATES COURT OF APPEALS
# FOR THE NINTH CIRCUIT

| | |
|---|---|
| SECURITIES AND EXCHANGE COMMISSION,<br>*Plaintiff-Appellee*,<br><br>v.<br><br>CMKM DIAMONDS, INC.,<br>*Defendant*,<br><br>and<br><br>1ST GLOBAL STOCK TRANSFER LLC;<br>HELEN BAGLEY; BRIAN DVORAK,<br>*Defendants-Appellants*. | Nos. 11-17021<br>11-17025<br><br>D.C. No.<br>2:08-cv-00437-<br>LRH-RJJ<br><br><br>OPINION |

Appeals from the United States District Court
for the District of Nevada
Larry R. Hicks, District Judge, Presiding

Argued and Submitted
April 15, 2013—San Francisco, California

Filed September 10, 2013

Before:  Susan P. Graber and Morgan Christen, Circuit Judges, and John R. Tunheim,[*] District Judge.

Opinion by Judge Tunheim

---

**SUMMARY[**]**

---

**Securities Law**

The panel affirmed in part, and reversed in part, the district court's orders in a civil enforcement action brought by the Securities and Exchange Commission against numerous defendants allegedly involved in a scheme to sell unregistered securities of CMKM Diamonds, Inc. in violation of Section 5 of the Securities Act of 1933.

The panel reversed the district court's grant of summary judgment against CMKM's transfer agent, 1st Global Stock Transfer, LLC and its owner Helen Bagley, because there was a material issue of fact regarding whether Global and Bagley were necessary participants and substantial factors in the distribution of CMKM's stock sufficient to impose liability under Section 5 of the Securities Act of 1933. The panel affirmed the magistrate judge's denial of the motion of Brian Dvorak, CMKM's attorney at the time of scheme, to stay the proceedings, and the district court's disgorgement order

---

[*] The Honorable John R. Tunheim, United States District Judge for the District of Minnesota, sitting by designation.

[**] This summary constitutes no part of the opinion of the court.  It has been prepared by court staff for the convenience of the reader.

(ordering defendants to disgorge proceeds from the illegal securities' sales, plus prejudgment interest) as to Dvorak.

## COUNSEL

Mark S. Dzarnoski (argued), Gordon & Silver Ltd., Las Vegas, Nevada, for Defendants-Appellants 1st Global Stock Transfer LLC and Helen Bagley.

John Wesley Hall, Jr. (argued), Law Offices of John Wesley Hall, Jr., Little Rock, Arkansas, for Defendant-Appellant Brian Dvorak.

Allan Armistead Capute (argued), Securities and Exchange Commission, Washington, D.C., for Plaintiff-Appellee.

## OPINION

TUNHEIM, District Judge:

These consolidated appeals arise out of a civil enforcement action brought by the Securities and Exchange Commission ("SEC") against numerous defendants allegedly involved in a scheme to sell unregistered securities of CMKM Diamonds, Inc. ("CMKM"). The district court granted summary judgment in favor of the SEC, ruling that 1st Global Stock Transfer, LLC ("Global"), Helen Bagley, and Brian Dvorak (collectively, "Defendants") participated in an unregistered distribution of securities in violation of Section 5 of the Securities Act of 1933 ("Securities Act"), 15 U.S.C. § 77e. The district court ordered Defendants to disgorge

proceeds from the illegal sales, plus prejudgment interest. Prior to the district court's ruling on summary judgment, Dvorak brought a motion to stay the civil proceedings until the conclusion of his criminal proceedings involving the same conduct, which a magistrate judge denied.

Global and Bagley appeal the district court's entry of summary judgment and the disgorgement order; Dvorak appeals the magistrate judge's order denying his motion to stay and the district court's disgorgement order. We conclude that the district court erred in granting summary judgment against Global and Bagley because a material issue of fact remains regarding whether Global and Bagley were necessary participants and substantial factors in the distribution of CMKM's stock sufficient to impose liability under Section 5. We therefore reverse the judgment of the district court as to Global and Bagley and remand for further proceedings. We affirm the magistrate judge's denial of Dvorak's motion to stay the proceedings and the district court's disgorgement order as to Dvorak.

## I.  BACKGROUND

### A.  The Scheme

CMKM is a publicly held Nevada corporation. During the relevant time period, CMKM's common stock was not registered with the SEC under the Securities Act, 15 U.S.C. § 77a *et seq.* CMKM's stock was registered, however, under Section 12(g) of the Securities Exchange Act of 1934 ("Exchange Act"), 15 U.S.C. § 78*l*(g), and was traded on the Pink Sheets, now known as OTC Pink, an electronic quotation and trading marketplace for both registered and unregistered securities.

Between January 2003 and March 2005, at least eleven individuals and three entities allegedly participated in a scheme to issue billions of shares of unrestricted CMKM stock and then sell the stock to the public without filing a registration statement. CMKM, holding itself out as a gold and diamond mining company, increased its number of shares to 800 billion. Urban Casavant and John Edwards, respectively CMKM's CEO and director of "post-merger matters," then began issuing and selling shares of unrestricted stock. CMKM in fact had no legitimate operations. The company issued false press releases, operated a promotional racing team that traveled around the country, and provided investors with fake maps and videos of mineral operations in North and South America. The proceeds of the stock sales were used primarily to finance the personal lifestyles of Casavant and Edwards. As a result of the scheme, approximately 40,000 investors lost at least $64.2 million.

In an attempt to appear to comply with securities regulations, Edwards received false opinion letters supporting the issuance of unrestricted CMKM stock from Defendant Dvorak. Based upon these letters, CMKM's transfer agent, Defendant Global and its owner Bagley, issued unrestricted shares of CMKM stock. Using these certificates, Edwards sold 260 billion shares of stock through Daryl Anderson, Kathleen Tomasso, and Anthony Tomasso. Anderson was Edwards' registered representative at NevWest Securities Corporation ("NevWest") and sold over 200 billion shares. Edwards also issued 77.3 billion shares of stock to companies owned by the Tomassos, which in turn sold the shares to the public.

## B. Dvorak's Role

Dvorak acted as CMKM's attorney during the course of the scheme. Casavant told Dvorak that numerous investors had already paid for shares of stock in CMKM when the company was in its initial stages, but stock certificates had never been issued to those investors. Casavant also told Dvorak that new certificates needed to be issued to certain investors whose shares were the subject of an earlier 100-for-one stock split. Casavant then began issuing those certificates. After receiving the newly issued CMKM stock certificates, Dvorak would write an opinion letter stating that the stocks referred to in the certificates should be issued without a restrictive legend.[1]

Dvorak's opinion letters indicated that the stocks issued by CMKM met the safe harbor of Rule 144(k), and therefore were exempt from registration under the Securities Act. *See* 15 U.S.C. § 77d(a)(1); 17 C.F.R. § 230.144(k).[2]  Dvorak's

---

[1] A restrictive legend placed upon a security alerts buyers that the security has not been registered under the Securities Act and may be offered and sold only if the security is registered, or its sale qualifies for an exemption from registration.  *See* Use of Legends and Stop-Transfer Instructions as Evidence of Nonpublic Offering, SEC Release No. 33-5121, 1971 WL 120470 (Feb. 1, 1971).  When the requirements of an exemption from registration have been met, however, an issuer will often seek to have the restrictive legend removed to avoid delays in the transfer and to make the securities more saleable.  *See* Robert A. Barron, *Some Comments on the Removal of Restrictive Legends and Stops from Restricted Securities Prior to the Sale of Such Securities*, 34 Sec. Reg. L.J. 308 (2006).

[2] In relevant part, Rule 144(k) provided that the unregistered sale of securities did not violate the Securities Act if the securities were held for at least two years by a nonaffiliate of the issuer.  *See* 17 C.F.R.

letters concluded that the stocks satisfied the two-year holding period of Rule 144(k) because, perhaps implausibly, the investors had paid for the stock or performed services for CMKM more than two years prior to issuance of the stock certificates or because a 100-for-one stock split had occurred more than two years earlier. Therefore Dvorak's letters concluded that the shares should be issued without a restrictive legend.

During the course of the scheme, Dvorak drafted 450 opinion letters regarding at least 233.7 billion shares of stock, issued to 258 individuals, that CMKM claimed could have been issued more than two years earlier. Dvorak received $318,843 from other participants in the scheme, including approximately $350 per opinion letter.

## C.  Global and Bagley's Role

Defendant Global is a Nevada corporation owned and operated by Bagley.  In October 2001, Global registered with the SEC as a transfer agent[3] pursuant to 15 U.S.C. § 78q-1(c) and in 2002 began serving as CMKM's transfer agent. During the course of the scheme, CMKM approved several increases in its number of authorized shares, until the number

---

§ 230.144(k) (2008).  Rule 144(k) has since been replaced by Rule 144(b) which changed the two-year holding period of Rule 144(k) to a one-year holding period.  *See* 17 C.F.R. § 230.144(b); *SEC v. M&A W. Inc.* 538 F.3d 1043, 1046 n.1 (9th Cir. 2008) (citing Revisions to Rules 144 and 155, Exchange Act Release No. 33-8869, 2007 WL 4270700 (Dec. 6, 2007)).

[3] Issuers of securities use transfer agents to, among other things, monitor the issuance of securities, register transfers of securities, and maintain the issuer's security holder records.  *See* 15 U.S.C. § 78c(a)(25).

of authorized shares approached 800 billion. Global and Bagley were notified of these authorizations, and between 2002 and 2004 Global issued up to 622 billion shares of unrestricted CMKM stock based on attorney opinion letters.

During most of 2003 and the first half of 2004, Bagley relied upon opinion letters written by Dvorak. Bagley testified that, relying on Dvorak's letters she understood that the stock was to be issued without a restrictive legend because payment for the stock had been made, or the stock split had occurred, at least two years earlier. Bagley also testified that she may have wondered whether all of the shares claimed by CMKM should actually have been issued two years earlier, that it seemed strange to her that CMKM had so many shares, and that nothing CMKM did as a company "made sense" to her. Bagley further testified that Global is "only the transfer agency. That's all we do. If we get proper paperwork, we do what needs to be done."

In June 2004, Bagley requested that Dvorak's opinions be confirmed by Edwards & Angell LLP ("Angell"), another law firm representing CMKM, because she was not comfortable with Dvorak's letters.[4] In their opinion letters, the Angell attorneys stated that "we have relied upon opinions . . . of Dvorak & Associates, Ltd. for each of the Shareholders to the effect that the already-issued shares as to which the Shares are being issued as dividends were issued more than two years ago and that the issuance of the Shares as dividends has

---

[4] In her deposition, Bagley did not testify to any particular events that made her feel uncomfortable with Dvorak's opinions, nor did she testify that she had any reason to doubt the accuracy of Mr. Dvorak's work. Bagley did state with respect to Dvorak that she "did not like him" and "didn't like his attitude."

been duly authorized." The Angell opinion letter also stated that "[w]e have examined such certificates, certified copies of organizational and governance documents, certificates of good standing, certifications of factual matters, company resolutions and other records, pertinent documents and instruments, and have investigated such other matters of law and fact, as we have deemed necessary for the purpose of rendering the opinions set forth herein." Finally, the Angell opinion letter concluded that "the Shares may be issued to the Shareholders . . . and that the certificates evidencing the Shares need bear no restrictive legend." An Angell attorney testified that he felt it was reasonable to rely upon the opinions expressed by Dvorak in writing Angell's opinion letters. The attorney testified that he believed Dvorak's opinion letters to be valid, and had no reason to believe the issuance of shares in reliance on the Dvorak opinion letters was wrongful.

## D.  Procedural History

On April 7, 2008, the SEC filed a complaint against Dvorak, Global, Bagley, and eleven other defendants in the United States District Court for the District of Nevada.  The complaint alleged violations of Section 5 of the Securities Act, 15 U.S.C. § 77e(a), which creates liability for the distribution of unregistered securities.

On March 25, 2009, an indictment was issued in the United States District Court for the District of Nevada based on the same set of facts that gave rise to the civil proceedings. The indictment named Dvorak, as well as five other defendants who are not parties to this appeal.

On December 23, 2010, the SEC filed a motion for summary judgment against Dvorak, Global, and Bagley. Global and Bagley, but not Dvorak, opposed the SEC's motion. On July 25, 2011, the district court granted summary judgment against all three Defendants, holding that there was no genuine issue of material fact that each Defendant was both a necessary participant and a substantial factor in the unregistered distribution of CMKM stock, and was therefore liable for violating Section 5 of the Securities Act. As to Global and Bagley, the district court concluded that they had played more than a de minimis role in the scheme, and that but for their participation in removing the restrictive legends on the CMKM stock certificates there would not have been a sale of unregistered securities. The district court rejected Global and Bagley's contention that summary judgment was inappropriate because a material issue of fact remained regarding whether they knew or had reason to know that the distribution of stock was illegal, concluding that Section 5 is a strict liability statute.

The district court entered final judgment on August 1, 2011. The court permanently enjoined Defendants from violating Section 5 and ordered disgorgement of profits gained as a result of violations of the Securities Act plus prejudgment interest. Specifically, the court ordered Dvorak to disgorge $409,638.11 and Bagley and Global, jointly and severally, to disgorge $448,047.87

On January 18, 2011, while the SEC's motion for summary judgment was pending, Dvorak filed a motion to stay the civil proceedings until the criminal proceedings concluded, arguing that a stay was necessary to protect his Fifth Amendment rights. In the alternative, Dvorak requested that the court grant him additional time to respond to the

SEC's motion for summary judgment. Specifically, Dvorak referenced the SEC's evidence related to the criminal proceedings, stating that "[w]ith 200 boxes of discovery waiting to be scanned and delivered to defense counsel in the criminal case, there may be more Dvorak will be able to present to defeat summary judgment."

United States Magistrate Judge Robert J. Johnston denied Dvorak's motion for a stay on April 7, 2011, rejecting Dvorak's argument that a stay was required by the Fifth Amendment. The magistrate judge also stated that Dvorak had not sought any particular discovery and had not referred in his moving papers to Federal Rule of Civil Procedure 56(d), suggesting that Dvorak's ability to respond to the SEC's motion for summary judgment would not be altered if the court did not stay the case.

Global and Bagley appeal the district court's grant of summary judgment and disgorgement order. Dvorak appeals the denial of his motion to stay the proceedings as well as the district court's disgorgement order.

## II. DISCUSSION

### A. Liability Under Section 5

Global and Bagley argue that the district court erred in granting summary judgment because genuine issues of material fact remain as to whether Global and Bagley's actions as a transfer agent satisfied the standard for liability under Section 5 of the Securities Act.

We review the district court's grant of summary judgment de novo, *SEC v. Platforms Wireless Int'l Corp.*, 617 F.3d

1072, 1085 (9th Cir. 2010), and view the evidence in the light most favorable to the nonmoving party to "determine whether there are genuine issues of material fact and whether the district court correctly applied the relevant substantive law," *Oak Harbor Freight Lines, Inc. v. Sears Roebuck & Co.*, 513 F.3d 949, 954 (9th Cir. 2008).

"Sections 5(a) and (c) of the Securities Act, 15 U.S.C. § 77e(a), (c), make it unlawful to offer or sell a security in interstate commerce if a registration statement has not been filed as to that security, unless the transaction qualifies for an exemption from registration." *Platforms Wireless*, 617 F.3d at 1085. Section 5(a)(1) "broadly prohibits sales of securities irrespective of the character of the person making them." *SEC v. Chinese Consol. Benevolent Ass'n*, 120 F.2d 738, 741 (2d Cir. 1941). To establish a prima facie case for violation of Section 5, the SEC must show that (1) no registration statement was in effect as to the securities; (2) the defendant directly or indirectly sold or offered to sell securities; and (3) the sale or offer was made through interstate commerce. *See SEC v. Phan*, 500 F.3d 895, 902 (9th Cir. 2007); *see also SEC v. Calvo*, 378 F.3d 1211, 1214 (11th Cir. 2004) (per curiam). "Once the SEC introduces evidence that a defendant has violated the registration provisions, the defendant then has the burden of proof in showing entitlement to an exemption." *SEC v. Murphy*, 626 F.2d 633, 641 (9th Cir. 1980) (citing *SEC v. Ralston Purina Co.*, 346 U.S. 119, 126 (1953)). Global and Bagley challenge only the first element of the SEC's prima facie case, arguing that they did not sell or offer to sell securities within the meaning of Section 5.

Although Section 5 provides that it is unlawful for any person to sell or offer to sell an unregistered security, 15 U.S.C. § 77e(a), (c), liability under Section 5 is not limited

to the person or entity who ultimately passes title to the security. *See Murphy*, 626 F.2d at 649. "Instead, courts have established the concept of 'participant' liability to bring within the confines of § 5 persons other than sellers who are responsible for the distribution of unregistered securities." *Id.* With respect to Section 5, a defendant's "role in the transaction must be a significant one before liability will attach." *Id.* at 648. Defendants play a significant role when they are "both a 'necessary participant' and 'substantial factor' in the sales transaction." *Phan*, 500 F.3d at 906 (quoting *Murphy*, 626 F.2d at 648, 652). We have previously stressed that the substantial factor test requires more than a finding of "but for" causation, explaining:

> Prior to the issuance of a security, numerous persons perform mechanical acts without which there could be no sale. For example, a printer may prepare key documents or a bank may advance cash to a customer upon the customer's presentation of an instrument and then pass the instrument to another person. Both would satisfy a "but for" causation test, but these acts nonetheless do not render the defendants sellers. Before a person's acts can be considered the proximate cause of a sale, his acts must also be a substantial factor in bringing about the transaction.

*Murphy*, 626 F.2d at 650 (citations omitted); *see also SEC v. Seaboard Corp.*, 677 F.2d 1289, 1294 (9th Cir. 1982). "The proximate cause analysis required by *Murphy* . . . usually involves a question of fact for the jury." *Anderson v. Aurotek*, 774 F.2d 927, 930 (9th Cir. 1985) (per curiam),

*overruled in part on other grounds by Pinter v. Dahl*, 486 U.S. 622 (1988).**[5]**

Global and Bagley first argue that the district court erred when it determined that Section 5 is a strict liability statute and failed to consider whether Global and Bagley knew or should have known that their conduct violated the Securities Act. Global and Bagley argue that, as transfer agents, they occupy a unique role in a securities transaction in which they perform largely ministerial tasks in reliance upon attorney opinion letters. Therefore, Global and Bagley argue, they can be liable under Section 5 only if they acted unreasonably in issuing the CMKM shares without a restrictive legend.

We have previously suggested that scienter is not an element of Section 5 liability. *See Phan*, 500 F.3d at 905–06. This is in accord with the majority of circuit courts that have

---

**[5]** In *Pinter*, the Supreme Court overruled the use of the "substantial factor" test for purposes of imposing liability under Section 12 of the Securities Act. 486 U.S. at 654. Section 12 provides that "[a]ny person who—(1) offers or sells a security in violation of [Section 5] . . . shall be liable . . . to the person purchasing such security from him." 15 U.S.C. § 77*l*(a). The *Pinter* court explained that "[t]he 'purchase from' requirement of § 12 focuses on the defendant's relationship with the plaintiff-purchaser. The substantial-factor test, on the other hand, focuses on the defendant's degree of involvement in the securities transaction and its surrounding circumstances." *Pinter*, 486 U.S. at 651.

Section 5 does not contain a similar "purchase from" requirement, and therefore we have held that *Pinter* did not overrule use of the substantial factor test for purposes of imposing Section 5 liability. *See Phan*, 500 F.3d at 906 n.13; *see also Geiger v. SEC*, 363 F.3d 481, 487–88 (D.C. Cir. 2004). Cases that preceded *Pinter* and described or applied the necessary participant and substantial factor test in the context of Section 12 continue to be relevant for purposes of defining the scope of that test with respect to Section 5. *See, e.g., Phan*, 500 F.3d at 906.

considered the question. *See Calvo*, 378 F.3d at 1215; *SEC v. Holschuh*, 694 F.2d 130, 137 n.10 (7th Cir. 1982); *Swenson v. Engelstad*, 626 F.2d 421, 424 (5th Cir. 1980). *But see Kane v. SEC*, 842 F.2d 194, 199 (8th Cir. 1988) (holding that Section 5 liability "extends to those persons who are uniquely positioned to ask relevant questions, acquire material information, or disclose their findings"). We conclude that a transfer agent's role in a securities distribution is not inherently unique and therefore does not justify subjecting transfer agents to a different standard for Section 5 liability than any other participant in the distribution of unregistered securities. Transfer agents are not, for example, the only potential participants in a securities distribution that may rely on the opinions of attorneys. Nor are transfer agents the only participants in a securities distribution that may play a ministerial or de minimis role. A transfer agent, like any other participant in a securities scheme, does not play precisely the same role in every transaction. Therefore, we decline to create an exception to strict liability for transfer agents, and we reaffirm that scienter is not an element of Section 5 liability.**[6]** As explained more fully below, the

---

**[6]** Because Section 5 is a strict liability statute, it appears that the district court erred in determining that good faith reliance on counsel could preclude liability under the statute. The cases cited by the district court in support of that proposition involved other provisions of the securities laws that do require scienter before imposing liability. *See SEC v. Goldfield Deep Mines Co. of Nev.*, 758 F.2d 459, 467 (9th Cir. 1985) (examining a good faith defense in the context of entry of a permanent injunction because an injunction may be entered only upon a finding of scienter to violate the securities laws); *SEC v. Savoy Indus., Inc.*, 665 F.2d 1310, 1314 n.28 (D.C. Cir. 1981) (discussing a good faith reliance defense in the context of liability under the anti-fraud provisions of the securities regulations that require a finding of scienter). In contrast "neither a good faith belief that the offers or sales in question were legal, nor reliance on the advice of counsel, provides a complete defense to a charge of violating

"necessary participant" and "substantial factor" test is better suited to determine participant liability. The myriad securities schemes and participant roles within those schemes must be considered by courts rather than a scienter requirement based upon the title of a participant.

In support of their position that transfer agents should face liability under Section 5 only when they act unreasonably, Global and Bagley rely primarily on Nevada state law. Under the Exchange Act, states are authorized to enact legislation governing transfer agents that is "not inconsistent" with federal securities regulations. 15 U.S.C. § 78q-1(d)(4). Transfer agents have a duty to register a transfer of stock under Nevada state law provided that the transfer is, among other things, rightful.[7] Global and Bagley argue that a reasonable belief that a transfer would be wrongful under federal securities law provides a transfer agent with a defense to the state law duty to register a transfer. Therefore, Global and Bagley argue that it is inconsistent for federal law to impose strict liability upon a transfer agent's wrongful transfer stock when compliance

---

Section 5 of the Securities Act." *SEC v. Friendly Power Co.*, 49 F. Supp. 2d 1363, 1368 (S.D. Fla. 1999) (citing *Holschuh*, 694 F.2d at 137).

[7] Courts have held that a request to remove a restrictive legend is substantially equivalent to a request to register a transfer under the Uniform Commercial Code. *See, e.g.*, *Am. Sec. Transfer, Inc. v. Pantheon Indus., Inc.*, 871 F. Supp. 400, 404–05 (D. Colo. 1994); *Bender v. Memory Metals, Inc.*, 514 A.2d 1109, 1115 (Del. Ch. 1986). We assume, without deciding, for purposes of Global and Bagley's argument that the requests in this case to remove the restrictive legends from CMKM shares would be subject to Nevada law governing a transfer agent's duty to register a transfer.

with the state law duty to register a transfer is subject to a reasonableness inquiry.

The existence of state law shielding a transfer agent from liability for failing to remove a restrictive legend based upon a reasonable belief that such a removal would be wrongful does not conflict with our holding that Section 5 is a strict liability statute.  Liability under state and federal law is mutually exclusive in this context.  If a transfer agent is found liable under Section 5 of the Securities Act for issuing shares without a restrictive legend, it is impossible for the transfer agent to be found liable under state law for refusing to issue that same share.  And a transfer agent will not face federal liability for **not** removing a restrictive legend, but may face state liability if it did not have a reasonable basis for its refusal.  Although the knowledge requirement for violations of state and federal law differs, that difference does not persuade us to incorporate an element of scienter into Section 5.

Because Section 5 imposes strict liability for violations of its registration requirement, we recognize that it is particularly important that the necessary participant and substantial factor test be carefully applied to each case so as not to subject defendants with a de minimis or insubstantial role in a securities scheme to strict liability.  With that in mind, we turn now to application of the necessary participant and substantial factor test to the facts of this case.

The district court found that Global and Bagley were necessary participants because, "but for their participation in removing the restrictive legends, there would not have been a sale of unregistered securities because the CMKM stock would still have the restrictive legend on each certificate."

The court went on to conclude that Global and Bagley were substantial factors in the scheme as a matter of law because they "issued billions of shares of CMKM stock without the restrictive legend and then transferred those unrestricted certificates to defendant NevWest for the purpose of sale to the general public." Global and Bagley argue that, even if Section 5 does not require scienter, their conduct as CMKM's transfer agent was insufficient to establish that they were a substantial factor in the scheme to distribute CMKM stock. The SEC argues, however, that Global and Bagley by virtue of their status as CMKM's transfer agent are necessarily liable under Section 5 because a transfer agent's role is "central to the distribution" of securities.

We reject the SEC's contention that Global and Bagley are necessarily liable under Section 5 by virtue of their position as CMKM's transfer agent. A participant's title, standing alone, cannot determine  liability under Section 5, because the mere fact that a defendant is labeled as an issuer, a broker, a transfer agent, a CEO, a purchaser, or an attorney, does not adequately explain what role the defendant actually played in the scheme at issue. Instead, whether a defendant is a substantial factor in the distribution of unregistered securities is a question of fact requiring a case-by-case analysis of the nature of the securities scheme and the defendant's participation in it. *See Anderson*, 774 F.2d at 930. This does not mean that summary judgment will never be appropriate, however. For example, in *Murphy* we affirmed the district court's grant of summary judgment in the SEC's favor regarding defendant's Section 5 liability because

> Murphy participated heavily in the offerings. . . . He devised the corporate financing scheme for [the issuer] . . . . He

> prepared and reviewed offering memoranda; he met personally with broker-dealers, investors and their representatives; and he spoke at broker-dealer sales seminars. There can be no gainsaying the importance of these acts: Murphy's extensive role in facilitating the transactions clearly was a substantial factor in the sales of unregistered securities.

*Murphy*, 626 F.2d at 638, 652. Similarly, in *Phan* we affirmed summary judgment holding the defendant liable under Section 5 where the defendant chose the date to call in the investor's $1.25 million obligation to the issuer, directed the investor to sell the shares in order to repay her obligation, provided the investor with a buyer, directed the issuer's lawyer to draft a contract for the stock sale, and instructed the investor where to send the proceeds. 500 F.3d at 906. Because of those facts we concluded that Phan "was both a 'necessary participant' and a 'substantial factor in' Wu's resale." *Id.*; *see also Calvo*, 378 F.3d at 1215 ("[T]he undisputed material facts amply support the district court's determination that, as a matter of law, Calvo illegally sold unregistered securities" where "Calvo negotiated and signed the contract with [the issuer] SOE pursuant to which [the brokerage] received the unregistered shares as compensation; he extended that contract on behalf of [the brokerage]; he signed the documents that opened the . . . brokerage account into which all of the unregistered SOE shares were deposited; he signed stock transfer authorization and stock powers for sales or transfers of stock out of [the] brokerage account; and he received proceeds–albeit through [the brokerage]–from the sale of SOE shares. Clearly, Calvo was a necessary participant and a substantial factor in the illegal sale of unregistered SOE stock.").

Here, the undisputed facts do not establish that Global and Bagley were substantial participants in the CMKM distribution as a matter of law. Global and Bagley read opinion letters from Dvorak, instructing them to remove the restrictive legends from CMKM stock, and then issued large quantities of those shares without the restrictive legend. Global and Bagley then requested a second opinion letter from Angell. After reading the Angell opinion letters, Global and Bagley continued to issue large quantities of shares without the restrictive legend.[8] This conduct is in stark contrast to the actions taken by the defendants in *Murphy*, *Phan*, and *Calvo*. The defendants in those cases were integrally involved in the securities-distribution schemes, from devising the scheme to finding investors and buyers to structuring the sales. That Global and Bagley issued large quantities of shares without a restrictive legend after receiving two attorney opinion letters is insufficient, in and of itself, to establish that Global and Bagley were substantial factors as a matter of law. Based upon this evidence, a reasonable jury could conclude that Global and Bagley were not substantial participants in the CMKM scheme. *See Geiger v. SEC*, 363 F.3d 481, 487 (D.C. Cir. 2004) ("[N]ot

---

[8] The district court reasoned that Global and Bagley "transferred those unrestricted certificates to defendant NevWest for the purpose of sale to the general public" **in concluding** that Global and Bagley were substantial factors in the scheme. But this fact was not undisputed in the record. The record indicates only that "Edwards hand delivered several recently issued stock certificates in CMKM stock to NevWest," and that "Edwards was delivering to NevWest newly issued stock certificates in CMKM stock." The SEC does not identify any portion of the record indicating that **Global and Bagley** transferred shares to NevWest. Therefore, the district court erred in relying on the fact that Global and Bagley transferred stocks to NevWest to support its conclusion that they were substantial factors in the CMKM distribution.

everyone in the chain of intermediaries between a seller of securities and the ultimate buyer is sufficiently involved in the process to make him responsible for an unlawful distribution." (internal quotation marks omitted)).  This case does not present evidence of significant and continuing involvement in the development and execution of a scheme to distribute securities in violation of the Securities Act like that which has supported the entry of summary judgment in other cases on the question of whether defendants were a substantial factor in a securities distribution.  Therefore, we reverse the district court's grant of summary judgment as to Global and Bagley and remand for proceedings consistent with this opinion.**[9]**

## B.  Motion to Stay

Dvorak appeals from the magistrate judge's denial of his motion to stay.  Dvorak challenges both the magistrate judge's authority to decide the motion, as well as the substantive reasons for the denial.

### 1.  Authority of the Magistrate Judge

"[A] district judge may designate a magistrate judge to hear any **nondispositive pretrial** matter pending before the court."  *Estate of Connors ex rel. Meredith v. O'Connor*, 6 F.3d 656, 658 (9th Cir. 1993); *see also* 28 U.S.C. § 636(b)(1)(A).  Under 28 U.S.C. § 636(b)(1)(B), a district judge may also authorize a magistrate judge to "conduct hearings, including evidentiary hearings, and to submit to a

---

**[9]** Because we remand on the issue of Global and Bagley's liability, we do not reach their arguments about the reasonableness of the district court's disgorgement order against them.

judge of the court proposed findings of fact and recommendations for the disposition" of motions that the magistrate judge lacks the authority to decide under § 636(b)(1)(a).  As we have noted:

> The primary difference between subsections (1)(A) and (1)(B) is that the former allows the magistrate judge to "determine" the matter (subject to the review of the district court for clear or legal error) while the latter allows the magistrate only to submit "proposed findings and recommendations" for the district court's *de novo* review.

*Reynaga v. Cammisa*, 971 F.2d 414, 416 (9th Cir. 1992) (quoting 28 U.S.C. § 636(b)(1)).

We have previously held that where the denial of a motion to stay is effectively a denial of the ultimate relief sought, such a motion is considered dispositive, and a magistrate judge lacks the authority to "determine" the matter.  *Id.* at 416–17.  We have not, however, squarely addressed the question of whether a motion to stay a civil proceeding, where the effect is not the denial of relief, is a nondispositive motion that may be determined by a magistrate judge under § 636(b)(1)(A).  The First Circuit has held that a motion to stay litigation that "is not dispositive of either the case or any claim or defense within it" may properly be determined by a magistrate judge.  *PowerShare, Inc. v. Syntel, Inc.*, 597 F.3d 10, 13–14 (1st Cir. 2010).  Here, Dvorak simply speculated that he might have stronger evidence to support his position in the civil proceedings if he was able to go through the criminal proceedings first.  The

magistrate judge's denial of Dvorak's motion to stay the civil proceedings did not dispose of any claims or defenses and did not effectively deny him any ultimate relief sought. Therefore Dvorak's motion to stay was nondispositive, and we conclude that the magistrate judge had authority to determine Dvorak's motion to stay under § 636(b)(1)(A).

### 2. Denial of Motion to Stay

In addition to challenging the magistrate judge's authority to rule on his motion, Dvorak raises numerous challenges to the substance of the magistrate judge's denial of his motion to stay the proceedings. However, Dvorak did not object to the magistrate judge's order in the district court, and he therefore has forfeited his right to appellate review of the order. *See Simpson v. Lear Astronics Corp.*, 77 F.3d 1170, 1174 (9th Cir. 1996) ("[A] party who fails to file timely objections to a magistrate judge's nondispositive order with the district judge to whom the case is assigned forfeits its right to appellate review of that order."); *see also Glenbrook Homeowners Ass'n v. Tahoe Reg'l Planning Agency*, 425 F.3d 611, 619–20 (9th Cir. 2005).

### C. Disgorgement

On appeal, Dvorak argues that the district court erred in ordering him to disgorge $409,638.11 because material issues of fact remain as to the appropriateness of that amount.[10] Specifically, Dvorak argues that bank records and exhibits that he produced at his deposition contain evidence indicating

---

[10] Dvorak disputes only the district court's disgorgement order and does not argue that the district court erred in entering summary judgment as to his liability under Section 5.

that $409,638.11 is not a reasonable approximation of the amount by which Dvorak was unjustly enriched.

"The district court has broad equity powers to order the disgorgement of 'ill-gotten gains' obtained through the violation of the securities laws." *SEC v. First Pac. Bancorp*, 142 F.3d 1186, 1191 (9th Cir. 1998) (citing *SEC v. Clark*, 915 F.2d 439, 453 (9th Cir. 1990)). "The district court also has broad discretion in calculating the amount to be disgorged." *SEC v. JT Wallenbrock & Assocs.*, 440 F.3d 1109, 1113 (9th Cir. 2006). In calculating disgorgement, a district court need only make a "reasonable approximation of profits causally connected to the violation" and is "not required to trace every dollar of the offering proceeds fraudulently retained by" the defendants. *First Pac. Bancorp*, 142 F.3d at 1192 n.6. (internal quotation marks omitted).

"The SEC bears the ultimate burden of persuasion that its disgorgement figure reasonably approximates the amount of unjust enrichment." *Platforms Wireless*, 617 F.3d at 1096 (internal quotation marks omitted). If the SEC establishes that the amount of disgorgement requested is a reasonable approximation of defendants' actual profits from the scheme, "the burden shifts to the defendants to demonstrate that the disgorgement figure was not a reasonable approximation." *Id.* (internal quotation marks omitted). Defendants bear the burden of showing unreasonableness because they "are more likely than the SEC to have access to evidence establishing what they paid for the securities, if anything, to whom the proceeds from the sales were distributed, and for what purposes the proceeds were used." *Id.*

Dvorak admits that the bank records and exhibits he now references were not part of the record before the district court,

because he failed to produce them or otherwise respond to the SEC's motion for summary judgment and request for a disgorgement order. Therefore, Dvorak has forfeited his right to appellate review of the district court's disgorgement order. *See Peterson v. Highland Music, Inc.*, 140 F.3d 1313, 1321 (9th Cir. 1998) ("We apply a general rule against entertaining arguments on appeal that were not presented or developed before the district court." (internal quotation marks omitted)). Dvorak argues on appeal, however, that arguments in his motion to stay constituted a response to the SEC's request for disgorgement. Specifically, Dvorak argues that his deposition and exhibits thereto "controverted" the reasonableness of the SEC's request for disgorgement. Because he could not afford a copy of his deposition transcript, Dvorak argues that the district court should have ordered the SEC to produce the entirety of Dvorak's deposition.

First, the district court did not err in failing to consider Dvorak's references to the disgorgement order made in connection with his motion to stay, because district courts are not required to review all papers filed in a case in order to determine if a party has raised arguments in other filings that could be construed as responsive to a pending motion. *See Simpson*, 77 F.3d at 1175–76 (ruling that a complaint about the amount of a sanctions order that was raised in a filing *other* than the motion for review of the sanctions order "did not put the district judge on notice that [the plaintiff] sought to contest the amount of sanctions."

Second, even if Dvorak is correct that his comments about discovery in his motion to stay constituted a response to the SEC's request for disgorgement, these arguments are insufficient to show that the district court abused its

discretion in ordering Dvorak to disgorge $409,638.11. In his briefing in support of the motion to stay litigation, Dvorak stated that portions of his deposition and exhibits thereto "clearly controverted" the amount of the SEC's disgorgement request. He requested that the SEC "fulfill its duty of candor to the court and file the entire deposition and all its exhibits as an exhibit to its Motion for Summary Judgment." But Dvorak did not indicate how the facts contained in his bank account records and deposition transcript would demonstrate the unreasonableness of the SEC's disgorgement request. Nor did Dvorak provide any explanation for why he was unable to produce his own bank account records and exhibits he produced at his deposition to oppose the SEC's request for disgorgement. Therefore, Dvorak failed to meet his burden of showing that the disgorgement figure was not a reasonable approximation of his illegal profits. *See Platforms Wireless*, 617 F.3d at 1096. Accordingly, we affirm the district court's disgorgement order as to Dvorak.

## CONCLUSION

A material issue of fact remains regarding whether Global and Bagley were necessary participants and substantial factors in the distribution of CMKM securities sufficient to impose liability under Section 5 of the Securities Act. Therefore, we reverse the grant of summary judgment as to Global and Bagley, and remand for further proceedings. We affirm the magistrate judge's denial of Dvorak's motion to stay and the district court's disgorgement order as to Dvorak.

**AFFIRMED in part, REVERSED in part and REMANDED.** The parties shall bear their own costs on appeal.