**DON D. ANDERSON & CO., Inc., and Don D. Anderson, Appellants,**

v.

**SECURITIES AND EXCHANGE COMMISSION, Appellee.**

No. 45–69.

United States Court of Appeals, Tenth Circuit.

March 31, 1970.

Delmer L. Stagner, Oklahoma City, Okl. (Erwin Alpern, Oklahoma City, Okl., on the brief), for appellants.

Theodore Sonde, Sp. Counsel, S.E.C., Washington, D. C. (Philip A. Loomis, Jr., Gen. Counsel, Walter P. North, Assoc. Gen. Counsel, and Patricia H. Latham, Atty., S.E.C., Washington, D. C., on the brief), for appellee.

Before MURRAH, PICKETT and BREITENSTEIN, Circuit Judges.

PICKETT, Circuit Judge.

This matter is before the court on petition of Don D. Anderson & Co., Inc. and Don D. Anderson of Oklahoma City, Oklahoma to review an order of the Securities and Exchange Commission (SEC) dismissing an application to review disciplinary action taken against the petitioners by the National Association of Securities Dealers, Inc. (NASD). The NASD is an association registered with the SEC under the cooperative regulation provisions of the Act, 15 U.S.C. 78o–3. The Anderson firm is a broker-dealer in securities registered with the Commission and a member of the NASD. Petitioners were charged by the NASD with violation of Article III, Section 1, Rules of Fair Practice,[1] in that during

---

1. Rules of the National Association of Securities Dealers, Article III, Section 1 of the Rules of Fair Practice, reads as follows:

"A member, in the conduct of his business, shall observe high standards of commercial honor and just and equitable principles of trade."

the accounting period ending November 30, 1966 petitioners failed to have and maintain net capital of not less than $5,000 in contravention of Section 240, 15c3–1 of the General Rules and Regulations under the Securities Exchange Act of 1934.[2] The firm was also charged with a violation of the "free-riding and withholding" provisions of Article III, Section 1, of the Association's Rules of Fair Practice. The latter violation is not contested here. The petitioners were found guilty, suspended from membership and registration with the NASD for fifteen days, plus $1,000 fine and costs assessed jointly and severally.[3] An appeal to the SEC was denied. Judicial review is authorized by Section 15A, Securities Exchange Act, 15 U.S.C. § 78y.

The petitioner company became a member of the NASD in 1961 with Anderson as its president and active operating head. From the beginning the petitioners were primarily engaged in the business of retailing and trading in over-the-counter, low-priced and speculative stocks. In 1966 the firm held 1,500 shares of American National Bank of Midwest City stock under subordination agreement with Fred H. Zahn, a director of the bank. To comply with the net capital requirements the stock value was listed at $40 per share, which was challenged by the NASD. In support of this value a number of affidavits and letters were relied upon. Shoemaker & Company, Inc., a stocks and bonds broker in Oklahoma City, Oklahoma, stated that as of January 11, 1966 it would bid $38 per share for the stock although it had no offerings. Again, in a letter of September 30, 1966 Shoemaker & Company, Inc. said it would quote the stock at 35–42 with a median figure of $38.50, stating that the spread in price was due to the stock being "very tightly held by a few in the bank." The last sale of the stock was in October 1966 at $35 per share. On April 6, 1967 the president of the bank thought the $35 figure was a conservative minimum. Anderson testified that he had an order to purchase 200 shares at $42 per share which he could not fill because there were no sellers at that price. He also stated that he had heard of some small transactions at $46 or $36 per share. The NASD determined the market value of the stock to be $26.62 per share based upon the book value.

To satisfy the "net capital rule" it was necessary for Anderson to use the 1,500 shares of American National Bank stock at a value of approximately $40 per share.[4] The record discloses that there was no listed or public market for the stock and that private sales were in-

---

2. Rule 15c3–1, 17 CFR 240, 15c3–1, of the General Rules and Regulations of the Securities Exchange Act of 1934, reads in part as follows:

"*Net Capital Requirements for Brokers and Dealers.*

"(a) Every broker or dealer shall have the net capital necessary to comply with all the following conditions:

\* \* \* \* \*

"(2) He shall have and maintain net capital of not less than $5,000 \* \* \*

\* \* \* \* \*

"(c) *Definitions.* For the purpose of this rule:

\* \* \* \* \*

"(2) The term 'net capital' shall be deemed to mean the net worth of a broker or dealer (that is, the excess of total assets over total liabilities), adjusted by

\* \* \* \* \*

"(B) Deducting fixed assets and assets which cannot be readily converted into cash. \* \* \* "

3. The responsibility of the NASD to discipline its members and its procedure therewith is reviewed by this court in Handley Investment Co. v. Securities and Exchange Com'n., 354 F.2d 64 (10th Cir. 1965).

4. In computing net capital, Anderson listed the 1,500 shares of American Stock on his Investment Account of November 30, 1966 at $40 per share with a cost of $30,000 and a market value of $60,000. This was by far the largest single item listed. By using the $40 figure, Anderson was in compliance with the rule, but if the $26.62 figure of NASD is used, a Net Capital Deficiency of $12,780.16 is shown. If any figure of $39 or less is used, a deficiency would result.

frequent. In computing the petitioners' net assets the NASD excluded this stock except for its book value because the stock was not readily convertible into cash.

■■ First, petitioners contend that the "net capital rule" was too uncertain to afford a proper guideline, and as such, its application to them would be a denial of due process. Ready convertibility into cash of assets held by a broker-dealer is to insure customers who have accounts with a broker that they can on reasonable demand liquidate their cash or securities position. In the Matter of Guy D. Marianette, 11 S.E.C. 967 (1942). The requirement of liquidity under the rule was well defined in Securities and Exchange Com'n. v. C. H. Abraham & Co., Inc., 186 F.Supp. 19, 21 (S.D.N.Y. 1960):

> "The Commission's rule requires an independent quotation and we need not labor the point that purchases by an interested party do not constitute an independent market. The Commission's requirement of independence is both logical and reasonable * * *."

Satisfaction of the "readily convertible into cash" provisions is not to be determined by proof of the intrinsic value of the asset alone, but by the amount which it can be sold for cash without delay. In the Matter of John W. Yeaman Inc., Sec. Exch.Rel. No. 7527 (Feb. 10, 1965); In the Matter of George A. Brown, Sec. Exch.Rel. No. 8160 (Sept. 19, 1967), and cases cited. There is nothing uncertain about this rule. All that is required is that there be a ready market for the liquidation of the assets.

The record discloses only quotations from interested parties, the president and directors of the bank, self-serving declarations and estimates from brokers admittedly showing no actual independent market. At the time the complaint was filed against petitioners, the "liquidity" test for compliance with the net capital rule was well established. A later SEC release clarifying the rule was merely a reiteration of the Commission's existing requirement and did not give retroactive application of new guidelines.[5]

■ Petitioners also argue that there was denial of due process because, to satisfy the "net capital rule", they, rather than the NASD or the Commission, were required to prove the value and ready convertibility into cash of the stock in question. We note at the outset that "(t)he net capital rule is one of the most important weapons in the Commission's arsenal to protect investors." Blaise D'Antoni & Associates, Inc. v. Securities Exch. Com'n., 289 F.2d 276, 277 (5 Cir. 1961), cert. denied, 368 U.S. 899, 82 S.Ct. 178, 7 L.Ed.2d 95. The purpose of the rule is to require broker-dealers to maintain a position of liquidity in their assets sufficient to permit them to meet the reasonable demands of customers. In computing net assets the Commission has excluded securities for which there is no ready market and has held that in the absence of an exchange or over-the-counter market, "(c)lear proof of ready convertibility into cash is required to overcome the absence of a professional market." In the Matter of George A. Brown, supra, and cases cited.[6] Petitioners contend that due process is violated by the Commission when it provides by rule that a prima facie violation of the "net capital rule" is made by a showing that there is no professional market for the securities and places upon them the bur-

---

5. Petitioners contended that the Sec.Exch. Rel. No. 8024 (Jan. 18, 1967) established a new guideline and the application of such would be retroactive, therefore violative of due process. As we have pointed out, this contention is without merit.

6. See Securities and Exchange Com'n. v. C. H. Abraham, supra; In the Matter of Whitney-Phoenix Company, Inc., 39 S.E. C. 245 (1959); In the Matter of Pioneer Enterprises, Inc., 36 S.E.C. 199 (1955); In the Matter of Guy D. Marianette, supra; In the Matter of Midwest Planned Investments, Inc., et al., Sec.Exch.Rel. No. 7564 (March 26, 1965).

den of coming forth with evidence of ready convertibility. With reference to the Commission's responsibility, we agree with the statement of the court in Securities & Exchange Com'n. v. Peerless-New York, 157 F.Supp. 328, 330 (S.D.N.Y.1958):

> " \* \* \* (T)he Commission is charged, in enforcing the legislation, with making rules and regulations 'necessary or appropriate in the public interest or for the protection of investors to provide safeguards with respect to financial responsibility of brokers and dealers.' \* \* \* In carrying out this responsibility, the Commission necessarily defined the term 'net capital' in such a manner as to render administration of the legislative command practicable. So long as such an administrative definition is reasonable and not inconsistent with Congressional mandate, it may not be disturbed by the courts."

A statutory presumption is not constitutionally impermissible, even in criminal cases, if there is a rational connection between the facts proved and the ultimate fact presumed. When there is such a rational connection, convenience in producing evidence of the ultimate fact may be considered but it is not a controlling factor. Tot v. United States, 319 U.S. 463, 63 S.Ct. 1241, 87 L.Ed. 1519 (1943). The Tot rule was recognized in Leary v. United States, 395 U.S. 6, 32, 89 S.Ct. 1532, 23 L.Ed.2d 57 (1969); United States v. Romano, 382 U.S. 136, 138, 86 S.Ct. 279, 15 L.Ed.2d 210 (1965); and United States v. Gainey, 380 U.S. 63, 85 S.Ct. 754, 13 L.Ed.2d 658 (1965). See also Colon-Rosich v. People of Puerto Rico, 256 F.2d 393 (1st Cir. 1958). In this case we think there is a rational connection between the lack of a professional market and the presumption that the stock is not readily convertible into cash if other methods of liquidation are relied upon. The infer-

ence is neither arbitrary nor strained. In the absence of a professional market it was indeed considerably more convenient and practical for the petitioners to prove that the stock was readily convertible into cash, since more likely than not the lack of a professional market would mean lack of ready convertibility. A cash purchaser must be found. The petitioners were in a much better position to show the ready convertibility of the stock than the Commission because knowledge of a ready market may be known only to them and others in a like position. In light of the rule that "(t)he evaluation of facts and the exercise of judgment for the protection of investors dealing in over-the-counter securities is a function assigned by Congress to the Commission rather than the courts," the exercise of the Commission's discretionary powers will not be disturbed by the courts except for cogent reasons. Associated Securities Corp. v. Securities & Exch. Com'n., 293 F.2d 738, 741 (10 Cir. 1960). We find no such cogent reasons to overturn the decision of the Commission.

Finally, Anderson contends that the sanctions imposed by the Commission were excessive. In applying sanctions for violations of Securities Exchange statutes or rules and regulations of the SEC the Commission has broad discretion and in the absence of clear abuse of that discretion the court will not substitute its views as to what the punishment shall be for such violation. Handley Investment Co. v. Securities and Exchange Com'n., 354 F.2d 64 (10 Cir. 1965); Tager v. Securities and Exchange Commission, 344 F.2d 5 (2 Cir. 1965); Associated Securities Corp. v. Securities & Exch. Com'n., *supra*. We find no clear abuse of discretion on the part of the Commission in the sanctions imposed upon petitioners.

Affirmed.