FILED
United States Court of Appeals
Tenth Circuit

April 3, 2015

Elisabeth A. Shumaker
Clerk of Court

**PUBLISH**

**UNITED STATES COURT OF APPEALS**

**TENTH CIRCUIT**

---

ACAP FINANCIAL, INC.; GARY
HUME,

      Petitioners,

v.

UNITED STATES SECURITIES AND
EXCHANGE COMMISSION,

      Respondent.

No. 13-9592

---

**Petition for Review of an Order of the
Securities and Exchange Commission
(SEC No. 3-15080)**

---

Timothy R. Pack (Brent R. Baker and D. Loren Washburn with him on the briefs),
of Clyde Snow & Sessions, Salt Lake City, Utah, for Petitioners.

Benjamin L. Schiffrin, Senior Litigation Counsel (Anne K. Small, General
Counsel, Michael A. Conley, Deputy General Counsel, John W. Avery, Deputy
Solicitor, and Christopher Paik, Special Counsel, with him on the brief), of the
Securities and Exchange Commission, Washington, D.C., for Respondent.

---

Before **GORSUCH**, **MURPHY**, and **MORITZ**, Circuit Judges.

---

**GORSUCH**, Circuit Judge.

---

Greyfield Capital was a defunct Canadian company.  That is, until a couple of con men got their hands on a signature stamp belonging to the company's former president.  The men made liberal use of that stamp, employing it to appoint themselves corporate officers, issue millions of unregistered shares in their names, and then embark on a classic penny stock pump-and-dump scheme.  They issued press releases touting Greyfield as a "premium automobile dealership" experiencing "explosive growth" and "quickly becoming the largest . . . in western Canada" — even though they never owned more than two used car lots between them.  For a while the scheme worked well:  the stock's price rose and the con men made out selling their shares to the public.  But as these things usually go, the truth couldn't be kept at bay forever and when it emerged the stock's value dropped, investors lost out, and authorities stepped in.

While the Greyfield culprits faced their problems, the investigation didn't end with them.  Regulators began looking for those who had helped facilitate the sale of Greyfield's unregistered shares.  And that eventually brought them to ACAP and Gary Hume.  ACAP is a penny stock brokerage firm in Salt Lake City and Gary Hume was its head trader and compliance manager.  Those behind the Greyfield scheme kept accounts at ACAP and used the firm to sell their shares and make their ill-gotten gains.  The Financial Industry Regulatory Authority (FINRA), a quasi-governmental agency responsible for overseeing the securities brokerage industry, was none too pleased.  Normally, a securities dealer may not

2

sell a company's stock to the public unless a registration statement disclosing the details of its financial condition is first on file with the Securities and Exchange Commission. *See* 15 U.S.C. §§ 77d-77g, 77aa. Of course, exceptions exist. Sometimes, for example, a company may sell unregistered shares to "accredited investors" considered sophisticated enough by virtue of their assets and experience that they don't need so much protection. *Id.* §§ 77b(a)(15), 77d(a)(5). But, FINRA found, no exception to the registration requirement applied here so the sales of unregistered Greyfield securities violated federal law. And, as securities industry professionals, ACAP and Mr. Hume violated FINRA rules by failing to take sufficient steps to guard against the firm's involvement in the unlawful trading of unregistered shares. *See* NASD Conduct R. 2110, 3010 (rules in effect at the time of the violation).

ACAP and Mr. Hume don't dispute their liability: the only questions before us relate to remedy. After consulting its administrative "Sanction Guidelines," FINRA decided to fine ACAP $100,000 and Mr. Hume $25,000, and to suspend Mr. Hume from the securities industry for six months. *See* FINRA, *Sanction Guidelines* (2011). For its part, the SEC reviewed and sustained these sanctions. *See ACAP Fin., Inc.*, Exchange Act Release No. 70046, 2013 WL 3864512 (SEC July 26, 2013); *see also* 15 U.S.C. § 78s(d). Now ACAP and Mr. Hume ask us to undo the decision. That is of course their right, though under current law our review is seriously circumscribed. It's sometimes said that we

3

may "interfere with" a sanction imposed by the SEC pursuant to its statutory authority only if it is "beyond the law," "unsupported factually," or "completely lack[ing] reasonableness such that it is an abuse of the SEC's discretion." *Rooms v. SEC*, 444 F.3d 1208, 1212 (10th Cir. 2006); *see also Am. Power & Light Co. v. SEC*, 329 U.S. 90, 112-13 (1946) (instructing that the SEC's choice of remedy is "peculiarly a matter for administrative competence"). No one before us disputes that these confining standards do and should control our review.

Instead, ACAP and Mr. Hume argue that they can satisfy them because FINRA's Sanction Guidelines reserve a six-month, all-capacity suspension like Mr. Hume's for "egregious" cases. *Sanction Guidelines*, *supra*, at 103. And, as ACAP and Mr. Hume tell it, the SEC has defined "egregious" conduct to denote the intentional or knowing violation of a regulatory duty or the breach of a fiduciary duty — something that didn't happen here. It's an argument that sounds promising on first encounter. After all, courts routinely fault agencies for "arbitrary and capricious" decisionmaking when they change an administrative policy without explanation. *See* 5 U.S.C. § 706(2)(A); *FCC v. Fox Television Stations, Inc.*, 556 U.S. 502, 515 (2009).

But it's an argument that fails in this case in its essential premise. ACAP and Mr. Hume do not identify any administrative rule or decision indicating that the SEC has ever concluded that intentional or knowing violations, or breaches of fiduciary duties, are *necessary* to a finding of "egregious" conduct. Instead, the

4

administrative cases they cite suggest such behavior is *sufficient* to trigger that vituperative epithet's application. The agency's case law leaves more than enough room for the possibility that other forms of misbehavior might qualify as "egregious." And that means the petitioners' argument fails on its own terms for they cannot show that the agency has changed preexisting policy. *See, e.g.*, *SEC v. First Pac. Bancorp*, 142 F.3d 1186, 1193-94 (9th Cir. 1998); *Kaminski*, Exchange Act Release No. 65347, 2011 WL 4336702, at *11 (SEC Sept. 16, 2011); *Dawson*, Investment Advisers Act Release No. 3057, 2010 WL 2886183, at *3 (SEC July 23, 2010).

Confirming our conclusion on this score is *World Trade Financial Corp.*, Exchange Act Release No. 66114, 2012 WL 32121 (SEC Jan. 6, 2012). In deeming the supervisory failures in that case "egregious," the SEC relied on the fact that the parties had "ignored the obvious need for inquiry" into particular trades despite a number of "red flags." *Id.* at *14. The Ninth Circuit affirmed the agency's holding, expressing its view that the supervisors had "made no reasonable efforts to carry out their legal duties." *World Trade Fin. Corp. v. SEC*, 739 F.3d 1243, 1250 (9th Cir. 2014). *World Trade*, then, found "egregious" conduct in circumstances that didn't involve the intentional or knowing violation of a regulatory duty or the breach of a fiduciary duty. If anything, the errors there were committed recklessly or maybe even negligently. The case, too, involved conduct strikingly similar to Mr. Hume's: like the *World Trade* supervisors, Mr.

5

Hume ignored a number of warning signs that the Greyfield sales were illegal. *See ACAP*, 2013 WL 3864512, at *10, 12. We readily acknowledge that *World Trade* was decided after the events in this case took place. But all the same it reveals that another circuit shares our understanding that the agency has never understood the term "egregious" to require proof of intent, knowledge, or a breach of a fiduciary duty as ACAP and Mr. Hume suppose.

Reading ACAP and Mr. Hume's opening brief at times we wondered whether they meant to pursue not only this argument but broader ones as well. In places their brief appears to fault the SEC for having failed to give sufficient content to the term "egregious" in past adjudicative proceedings, leaving members of the securities industry without fair warning about when their conduct might invite the epithet's application. Certainly close cousins in the law's large clan of vituperative epithets ("wanton," "wicked," and "gross" come quickly to mind) have proven anything but self-defining. *See, e.g.*, *Steamboat New World v. King*, 57 U.S. (16 How.) 469, 474 (1853); *Daniels v. Williams,* 474 U.S. 327, 334 (1986); *Wilson v. Brett*, (1843) 152 Eng. Rep. 737 (Exch.) 739 (opinion of Rolfe, J.). Reading the opening brief we wondered, too, whether the petitioners meant to suggest that it was arbitrary and capricious for the agency to use this adjudicative proceeding to expand its definition of the term "egregious" beyond intentional and knowing misconduct and breaches of fiduciary duties and then apply its newly expanded definition retroactively to Mr. Hume. That's certainly a species

6

of argument with a long provenance of its own. *See, e.g.*, *SEC v. Chenery Corp.*, 332 U.S. 194, 216-17 (1947) (Jackson, J., dissenting); Henry J. Friendly, *The Federal Administrative Agencies: The Need for Better Definition of Standards*, 75 Harv. L. Rev. 863, 867 (1962); *Stewart Capital Corp. v. Andrus*, 701 F.2d 846, 848 (10th Cir. 1983) (identifying circumstances in which retroactive agency adjudication can be an abuse of discretion).

But in their reply brief ACAP and Mr. Hume clarify that they aren't seeking to pursue any argument along these lines — and they even disclaim the attempt. In their reply, they concede that the agency *is* permitted to flesh out the meaning of the term "egregious" in successive adjudications; that its administrative case law already "*has* fleshed out the contours of what constitutes 'egregious' conduct"; and that the SEC simply applied the epithet in this case in a manner at odds with that definition. Pet'rs' Reply Br. 3. So it is we are left with no occasion to pass on any of the meatier arguments we imagined might be before us and all that remains is the claim that the SEC has defined "egregious" to require a showing of intentional or knowing misconduct or a breach of a fiduciary duty and deviated from that definition here — a claim that as we've seen is easily dispelled.

Attempting a different tack, ACAP and Mr. Hume next suggest that the SEC acted arbitrarily by failing to consider certain mitigating factors identified in FINRA's Sanction Guidelines. And here again, in principle at least, they might

7

have something: an agency's unexplained failure to consult its own decisional guidelines can be the makings of a claim of arbitrary decisionmaking and the basis for reversal. *See, e.g.*, *Cotton Petroleum Corp. v. U.S. Dep't of the Interior*, 870 F.2d 1515, 1527 (10th Cir. 1989) (overturning a decision by the Secretary of the Interior in part because "the Secretary simply failed to set forth, discuss and analyze all of the factors his own guidelines . . . required of him").

But in this instance it's the record that stands in the way. Before the SEC, ACAP and Mr. Hume pursued five mitigating arguments so we must limit our analysis to them. *See* 15 U.S.C. § 78y(c)(1). And the record reveals that the SEC considered them all. Take ACAP and Mr. Hume's argument that they accepted responsibility for their actions and implemented enhanced compliance procedures. These are indeed listed as mitigating factors in the Sanction Guidelines. But the SEC found that the petitioners accepted responsibility and sought to ensure compliance only *after* FINRA launched disciplinary proceedings against them. Meanwhile, the guidelines instruct the agency to ask whether a party took steps toward responsibility and remediation "*prior* to detection." *Sanction Guidelines*, *supra*, at 6 (emphasis added). ACAP and Mr. Hume next point to the low price at which the Greyfield stocks sold and the low value of the commissions the sales generated, also mitigating factors mentioned in the guidelines. But the SEC reasoned that these relatively modest figures were outweighed by the danger posed by the large quantity of unregistered shares traded without supervision —

8

an aggravating factor mentioned in the guidelines too. *Id.* at 24 (listing the "[s]hare volume" as a relevant consideration); *see also id.* at 6 (noting that the factors listed in the guidelines can be aggravating, mitigating, or both, and directing adjudicators to weigh them as appropriate). Finally, ACAP suggests it can't afford the fines imposed on it. Yet the SEC rejected this argument because ACAP didn't provide the agency information about its financial circumstances.

Of course, the SEC didn't buy the petitioners' mitigation arguments. But the duty to hear an argument doesn't entail the duty to swallow it. Neither do ACAP and Mr. Hume suggest that the agency should be forbidden from "balancing" competing mitigating and aggravating sentencing factors and assigning one or another greater or lesser weight (as it did here in deciding, for example, that the quantity of shares involved outweighed their dollar value). Nor do the petitioners argue that the agency is forbidden from making its balancing judgments retroactively applicable to litigants like them. Instead and again, ACAP and Mr. Hume present us only with a narrow challenge, disputing whether the SEC offered a reasoned explanation for its decision to reject their mitigation arguments. At least that much the agency did.

The cases on which ACAP and Mr. Hume most seek to rely underscore the point. In *PAZ Securities, Inc. v. SEC*, 494 F.3d 1059 (D.C. Cir. 2007), the court concluded that the SEC "mischaracterized the petitioners' argument" in favor of mitigation. *Id.* at 1065. In *Saad v. SEC*, 718 F.3d 904 (D.C. Cir. 2013), the court

9

found that the SEC failed to discuss certain mitigating factors at all, dispensing with them in a "blanket statement." *Id.* at 914. Quite unlike in those cases, the agency in this case analyzed each of the mitigation arguments presented to it and offered particularized grounds for rejecting them. So it seems Mr. Hume's cases are perhaps instructive more as studies in contrast than resemblance to our own.

Moving to their final argument, ACAP and Mr. Hume suggest that the remedies the SEC endorsed were too harsh. By statute, the SEC must set aside or reduce any FINRA sanction that is "not necessary or appropriate in furtherance of the purposes of [the act] or is excessive or oppressive." 15 U.S.C. § 78s(e)(2). For his part, Mr. Hume contends that the SEC's decision to impose a six-month, all-capacity suspension was inappropriate because his violations occurred only in his role as a supervisor. But given the unrebutted evidence of extensive supervisory failures in this case the agency concluded that Mr. Hume's conduct went so far as to cast doubt on his ability to carry out his obligations as a securities professional in any capacity. No one before us disputes this much can sometimes happen. *See, e.g.*, *Horning v. SEC*, 570 F.3d 337, 346 (D.C. Cir. 2009) (acknowledging that "problems in one area" can be "indicative of future risk in a different area"). And, in fact, the six-month, all-capacity suspension the agency issued is comparable to sanctions it has imposed in other cases with similar facts. *See, e.g.*, *ACAP*, 2013 WL 3864512, at *18 n.171 (collecting cases). Neither does

10

Mr. Hume pursue any larger argument suggesting, say, that the agency's past practices themselves violate the statutory standard governing remedial sanctions.

Turning to the fines, ACAP and Mr. Hume argue that the amounts imposed were excessive because they outstrip the commissions the firm earned on its unlawful Greyfield sales. The problem here is that the profit to the firm or individual under investigation is, once more, only one factor among many that the SEC balances when fashioning a remedial sanction:

> The seriousness of the offense, the corresponding harm to the trading public, the potential gain to the broker for disobeying the rules, the potential for repetition in light of the current regulatory and enforcement regime, and the deterrent value to the offending broker and others are all relevant factors to be considered in deciding whether the sanction is appropriately remedial and not excessive and punitive.

*McCarthy v. SEC*, 406 F.3d 179, 190 (2d Cir. 2005); *accord, e.g.*, *Siegel v. SEC*, 592 F.3d 147, 158 (D.C. Cir. 2010). Neither, once more, do ACAP and Mr. Hume challenge the SEC's ability to employ multi-factor balancing tests in adjudications when deciding what sanctions to issue (retroactively) to the case at hand. They don't dispute the fact that, applying its balancing test for setting fines, the agency has in the past approved sanctions that greatly exceed any profit earned by the party to be disciplined. *See, e.g.*, *World Trade*, 2012 WL 32121, at *4, 13, 15, *petition for review denied*, 739 F.3d 1243 (9th Cir. 2014) ($110,000 in total fines for $9,270 in commissions); *Busacca v. SEC*, 449 F. App'x 886, 888-89 (11th Cir. 2011) (per curiam) ($30,000 in fines for operational failures with no

11

mention of profit or commissions); *Midas Sec., LLC*, Exchange Act Release No. 66200, 2012 WL 169138, at \*5, 7, 17 (SEC Jan. 20, 2012) ($130,000 in total fines for $2,200 in commissions). And they don't dispute that the fines issued here were well within the baseline range suggested by the Sanction Guidelines even for "nonegregious" cases. Given all this, we again cannot see how we might overturn the agency's decision.

No doubt the open-ended nature of the multi-factor balancing tests the SEC uses when setting sanctions could be attacked on a variety of potential grounds. But the petitioners before us have repeatedly demurred when presented with the opportunity to challenge the propriety of the SEC's decisionmaking processes, asking us only to decide much narrower questions — such as the consistency of the results reached here with those in earlier cases. And when it comes to those narrower questions, we are unable to discern any basis on which we might deem the agency's decision impermissible under the standards of review that cabin our involvement in this case. The petition for review is denied.

12