**FILED**
**United States Court of Appeals**
**Tenth Circuit**

**March 9, 2018**

**Elisabeth A. Shumaker**
**Clerk of Court**

**UNITED STATES COURT OF APPEALS**

**FOR THE TENTH CIRCUIT**
_____

KEITH D. GEARY,

     Petitioner,

v.

SECURITIES AND EXCHANGE
COMMISSION,

     Respondent.

No. 17-9522
(SEC No. 3-17406)
(Petition for Review)

_____

**ORDER AND JUDGMENT**[*]
_____

Before **BRISCOE**, **HARTZ**, and **McHUGH**, Circuit Judges.
_____

Keith D. Geary seeks review of a ruling by the Securities and Exchange

Commission (SEC or Commission) affirming disciplinary action taken against him by

the Financial Industry Regulatory Authority (FINRA).[1]  Exercising jurisdiction under

15 U.S.C. § 78y(a), we deny the petition for review.

---

[*] After examining the briefs and appellate record, this panel has determined unanimously to honor the parties' request for a decision on the briefs without oral argument.  *See* Fed. R. App. P. 34(f); 10th Cir. R. 34.1(G).  The case is therefore submitted without oral argument.  This order and judgment is not binding precedent, except under the doctrines of law of the case, res judicata, and collateral estoppel.  It may be cited, however, for its persuasive value consistent with Fed. R. App. P. 32.1 and 10th Cir. R. 32.1.

[1] FINRA is "a quasi-governmental agency responsible for overseeing the securities brokerage industry."  *ACAP Fin., Inc. v. U.S. SEC*, 783 F.3d 763, 765 (10th Cir. 2015).

# I. BACKGROUND

Mr. Geary was the owner, president, and chief executive officer of a former FINRA-member firm, Geary Securities, Inc. (GSI). Under the SEC's net capital rule and GSI's FINRA member agreement, the firm was required to maintain at least $250,000 in net capital at all times. *See* 17 C.F.R. § 240.15c3-1(a)(2)(i); Admin. R., Vol. 2 at 443. The SEC found that in May 2009 and again in February 2010, Mr. Geary permitted GSI to operate while it lacked the required net capital, in violation of the net capital rule and FINRA Rule 2010, which requires FINRA members and associated persons to "observe high standards of commercial honor and just and equitable principles of trade."[2]

## A. First Net Capital Violation

GSI's first net capital violation occurred on May 28 and 29, 2009. In the spring of that year, Mr. Geary began pursuing a plan to purchase, repackage, and resell collateralized mortgage obligations (CMOs) in connection with a Credit Enhanced Mortgage Pool (CEMP). In early May, he discussed his CEMP plans with GSI's primary financial and operations principal, Norman Frager, who warned Mr. Geary, "We can't do this in the broker-dealer [GSI]. We don't have the capital. You have to set up a special purpose entity." Admin R., Vol. 1 at 125 (internal quotation marks omitted).

---

[2] FINRA Rule 2010 applies to associated persons through FINRA Rule 0140(a).

Nonetheless, on May 28, Mr. Geary caused GSI to buy CMOs from Frontier State Bank for approximately $77 million. At that time, GSI had approximately $1 million in net capital. Mr. Geary purchased the CMOs for GSI on that date without a customer re-purchaser in mind. *Id.*, Vol. 2 at 358. Instead, he intended that GSI's clearing firm, Pershing LLC, would hold the CMOs in GSI's account, awaiting the closing of the CEMP transaction. *Id.* at 359. But on May 29, when Pershing discovered it had paid Frontier for the CMOs but had not received payment from GSI, Pershing issued GSI a $31.8 million margin call for the purchase. Mr. Geary requested financing from Pershing, but Pershing refused. Mr. Geary did not direct GSI to cease conducting securities business on May 28 or 29, 2009.

Mr. Geary did not discuss this specific CMO purchase with Mr. Frager beforehand. *Id.* at 361-62. When he told Mr. Frager about it the following Monday, June 1, Mr. Frager responded that GSI could not hold the CMOs. *Id.* at 364. Mr. Geary understood from this discussion with Mr. Frager that his CMO trade had created a net capital violation. *Id.* at 361. Later that day, Mr. Geary arranged for Frontier's president, Joseph McKean, to repurchase the CMOs at the original $77 million price. The resales of the CMOs occurred on June 1 and June 3. GSI's net capital report for May 2009, prepared by Mr. Frager, did not reflect the CMOs in GSI's account or any net capital deficiency.

During an examination of GSI in November 2009, FINRA concluded that GSI had erroneously excluded the CMO purchases from its May 2009 net capital calculation. FINRA determined that the purchase of the CMOs resulted in an

3

approximately $11 million net capital deficiency. It therefore asked GSI to file a net capital deficiency notice, but Mr. Frager refused, indicating that he would instead ask Pershing to change its trading records to reflect that GSI had resold the CMOs to Mr. McKean as of May 28, instead of June 1 and June 3, 2009. Pershing ultimately agreed to change the recorded trade date for the resales to May 28. Mr. Geary characterized Mr. Frager's action as "backdat[ing] the [trade] tickets to make the capital violation go away." *Id.* at 368 (internal quotation marks omitted). Based upon this after-the-fact revision of the recorded trade date, Mr. Geary disputes the SEC's finding of a net capital violation on May 28 and 29, 2009.

## B. Second Net Capital Violation

GSI's second violation occurred over a period of fifteen days in February 2010.[3] In late 2009 and early 2010, GSI's finances were declining, in part due to the failure to close a CEMP transaction in December. Mr. Frager warned Mr. Geary in January 2010 that GSI's net capital was deteriorating and the firm was getting close to a violation. *Id.* at 371-72. Mr. Frager outlined several steps that GSI could take to avoid a capital deficiency, including closing the anticipated CEMP deal, obtaining a capital infusion of at least $500,000 from another source, or amending GSI's FINRA membership to lower its applicable net capital requirement from $250,000 to $100,000. *Id.* at 393-94. Mr. Geary assured Mr. Frager that he would pursue a bank loan to address GSI's net capital issues. *Id.* at 394. At that time, Mr. Frager

---

[3] Although Mr. Geary challenges the sanctions imposed, in part, based on a second net capital violation by GSI in February 2010, he does not dispute the SEC's finding of a net capital violation at that time.

4

specifically warned Mr. Geary about the implications of violating the net capital rule, advising him "if you violate, you have to cease doing business," in other words, "stop taking orders," which would mean "you might as well go out of business." *Id.* at 398 (internal quotation marks omitted); *see also id.* at 335 (Mr. Geary's testimony acknowledging this warning).

The CEMP deal did not close in January 2010, and as of January 31, GSI had a net capital deficiency of approximately $55,000. Mr. Geary was aware of the deficiency by February 4, 2010. He transferred $75,000 of his personal funds to GSI and also began pursuing a short-term $750,000 bank loan. But Mr. Geary's hoped-for loan was delayed through most of February and the infused funds were not sufficient to eliminate the net capital deficiencies. The SEC found that GSI violated the net capital rule on fifteen days in February 2010, yet GSI continued its operations throughout that month. Mr. Geary admitted it was ultimately his responsibility to stop the firm from doing business with deficient net capital. *Id.* at 378.

### C. Disciplinary Action

FINRA found that Mr. Geary knowingly, or at least recklessly, permitted GSI to operate with deficient net capital in May 2009 and again in February 2010, in violation of the SEC's net capital rule and FINRA Rule 2010.[4] FINRA barred him from acting in a principal or supervisory capacity with any FINRA member firm, suspended him for 30 business days in all capacities, and fined him $20,000. The

---

[4] FINRA also brought charges against Mr. Frager, which were ultimately settled.

SEC affirmed FINRA's findings regarding the net capital violations and upheld the sanctions imposed on Mr. Geary.

## II.    DISCUSSION

### A.    Standards of Review

The SEC's factual findings are conclusive if supported by substantial evidence.  15 U.S.C. § 78y(a)(4).  "Substantial evidence is a minimum quantity of relevant evidence objectively adequate to support the findings when viewed in light of the record as a whole.  If the evidence is capable of rational interpretation that would favor either side, the SEC's findings will not be overturned on appeal." *Rooms v. SEC*, 444 F.3d 1208, 1212 (10th Cir. 2006) (citation and internal quotation marks omitted).  We review the Commission's legal conclusions de novo.  *Id.*

In applying sanctions, "the Commission has broad discretion and in the absence of clear abuse of that discretion the court will not substitute its views as to what the punishment shall be for [a] violation."  *Don D. Anderson & Co. v. SEC*, 423 F.2d 813, 817 (10th Cir. 1970).  "[W]e may interfere with a sanction imposed by the SEC pursuant to its statutory authority only if it is beyond the law, unsupported factually, or completely lacking reasonableness such that it is an abuse of the SEC's discretion."  *ACAP Fin., Inc. v. U.S. SEC*, 783 F.3d 763, 765 (10th Cir. 2015) (brackets and internal quotation marks omitted).

### B.    Net Capital Violation on May 28 and 29, 2009

Mr. Geary contends that the SEC erred in finding that GSI had a net capital violation on May 28 and 29, 2009.  He concedes that "the critically important

6

question was whether [GSI] had a liability associated with the CMO purchases as of May 29. If yes, a net capital deficiency occurred. If no, a net capital deficiency did not occur." Aplt. Br. at 13. Mr. Geary argues that the SEC's decision that a violation occurred is not based on substantial evidence because it ignored the testimony of FINRA's net capital expert that a firm's liability for purchasing a security, such as the CMOs here, arises on the trade date, and correspondingly, a firm's liability ceases on the trade date for the sale of the security to a customer. *See* Admin. R., Vol. 2 at 308-09, 310-11 (FINRA expert's testimony). Pointing to the revised trade date for GSI's sales of the CMOs to Mr. McKean, he argues that GSI's liability for the CMOs arose and disappeared on the same date—May 28. Thus, he urges, zero liability existed on that date and no deficiency or violation occurred.

Mr. Geary fails to demonstrate that the SEC's finding of a net capital violation in May 2009 lacks substantial evidentiary support. The SEC acknowledged the FINRA expert's testimony, but concluded that "[t]he backdated trade date was irrelevant to the calculation of GSI's net capital and its net capital violation" because "the repapering of the trade date did not reflect the reality of the transaction." Admin. R., Vol. 1 at 26 (internal quotation marks omitted). The SEC found that:

> Geary admitted, and the contemporaneous records and e-mails confirm, that GSI held all of the CMOs on May 28 and May 29 in its own Pershing proprietary account; that Geary ordered the purchase intending to hold the CMOs for two to three weeks (not to immediately resell them); and that Geary did not discuss a CMO repurchase with McKean until June 1. GSI's success, after the fact, in amending the recorded trade date in no way changes the reality that GSI—and not McKean or Frontier—held the CMOs on May 28 and May 29 and was required to include them in calculating its net capital.

7

*Id.* at 25-26. And the FINRA expert's testimony supports, rather than contradicts, the SEC's conclusion. She testified that the revised trade date did not reflect the reality of the transaction and that a firm is not permitted to remove a liability from its books on the basis of a retroactive change in the trade date with no legitimate basis. *See id.*, Vol. 2 at 311-12.

Nor does Mr. Geary show any error of law in the SEC's violation determination. He cites no precedent for his contention that backdating trading records can alleviate a previous net capital deficiency, while the SEC relied on its own prior decisions rejecting post-dated, after-the-fact evidence. *See id.*, Vol. 1 at 26 & n.19. Moreover, Mr. Geary's contention is incompatible with the purpose of the net capital rule "to protect investors" by "requir[ing] broker-dealers to maintain a position of liquidity in their assets sufficient to permit them to meet the reasonable demands of customers." *Don D. Anderson & Co.*, 423 F.2d at 816 (internal quotation marks omitted); *see also Touche Ross & Co. v. Redington*, 442 U.S. 560, 570 (1979) (describing the net capital rule as "the principal regulatory tool by which the Commission and the Exchange monitor the financial health of brokerage firms and protect customers from the risks involved in leaving their cash and securities with broker-dealers."). Thus, what matters, for purposes of the rule, was the reality of the CMO transaction and GSI's actual net capital situation in May 2009.

Mr. Geary also argues there was no evidence that he had any knowledge, awareness, or suspicion on May 28 or 29, 2009, that GSI was in violation of the net capital rule. But the SEC found—and he admitted—that as GSI's president he was

8

responsible for the firm's compliance with the net capital rule. And the evidence showed that his own purchase of the CMOs, contrary to Mr. Frager's clear warning not to do so, led to GSI's May 2009 violations. The SEC rejected his contention that he lacked the knowledge base to understand that the CMO purchase would trigger a net capital violation, holding instead that "Geary had to know that Frager's instruction was linked to net capital concerns even if Frager did not expressly state the net capital ramifications." Admin. R., Vol. 1 at 27 (internal quotation marks omitted). The SEC found, in any event, that Mr. "Geary's actions reflect[ed] a reckless disregard for the clear purpose of the net capital rule," *id.*, because he "well knew, when he acquired the CMOs, that the firm unquestionably lacked the funds to pay the $77 million purchase price or even meet Pershing's impending margin call," *id.* at 28. The SEC's finding that Mr. Geary acted at least recklessly is supported by substantial evidence.[5]

### C.    Sanctions

Mr. Geary argues that the SEC abused its discretion in affirming the sanctions imposed by FINRA. He contends the SEC: (1) improperly disregarded numerous mitigating factors applicable under the FINRA Sanction Guidelines that are supported by the evidence, and (2) failed to sufficiently identify a remedial purpose

---

[5] Mr. Geary also contends there is no evidence he was responsible for GSI filing an inaccurate monthly report for May 2009 or Mr. Frager's refusal to file a net capital deficiency notice in November 2009. But as the SEC noted, FINRA's violation findings were based not on these actions but "solely on his responsibility for allowing the firm to operate without required net capital." Admin. R., Vol. 1 at 28.

for the sanctions.[6]  We reiterate that our review of sanctions imposed by the SEC is

"seriously circumscribed."  *ACAP Fin.*, 783 F.3d at 765.  "[I]n the absence of a clear

abuse of . . . discretion the court will not substitute its views as to what the

punishment shall be for [a] violation."  *Don D. Anderson & Co.*, 423 F.2d at 817.

### 1.  FINRA Sanctions Guidelines and Sanctions Imposed

FINRA applied its published 2015 Sanctions Guidelines in imposing sanctions

on Mr. Geary.  *See*, *generally,*

https://www.finra.org/sites/default/files/2015_Sanction_Guidelines.pdf.[7]  For

violations of the SEC's net capital rule and FINRA Rule 2010, the guidelines

recommended a fine of $1,000 to $73,000 and a suspension in any or all capacities

for up to 30 business days.  Add. at 29.  For egregious violations by individuals, the

guidelines recommended a lengthier suspension of up to two years, or a bar.  *Id.*

FINRA found that Mr. Geary's conduct was egregious and that he was directly

responsible for the net capital violations.  FINRA barred him from acting in a

principal or supervisory capacity with any FINRA member firm, suspended him for

---

[6] We address the contentions of error that Mr. Geary develops in Section IV of his appeal brief.  In Section III, he makes general, undeveloped assertions that the sanctions imposed are contrary to both the evidence and the FINRA Sanctions Guidelines; the sanctions are punitive; the SEC's arbitrary application of the Sanctions Guidelines deprived him of due process; and the SEC's analysis was not reasoned, logical, or rational.  We decline to address these perfunctory allegations of error, which are insufficient to invoke our appellate review.  *See Kelley v. City of Albuquerque*, 542 F.3d 802, 819-20 (10th Cir. 2008).

[7] The SEC included relevant provisions of the 2015 FINRA Sanction Guidelines in an Addendum to its appeal brief.  For ease of reference, we will cite to the pertinent pages of that Addendum (Add.).

30 business days in all capacities, and imposed a $20,000 fine. In upholding these sanctions, the SEC noted FINRA's focus on "the large amount of the 2009 net capital deficiency that [Mr. Geary's] own trading triggered, the extended 2010 deficiency period, and the short time between the two deficiency periods, which demonstrated a pattern of misconduct." Admin. R., Vol. 1 at 29.

## 2. The SEC Did Not Disregard Mitigating Factors

Mr. Geary argues that the SEC erred in its consideration of numerous mitigating factors under the Sanctions Guidelines that are supported by the record. He contends that the SEC recognized some of these factors while disregarding others, and essentially attributed no weight to any mitigating factors. The SEC agreed with FINRA that "the factors he identified were either not mitigating or were outweighed by other, aggravating factors and therefore did not justify lesser sanctions." *Id.* at 30. On appeal, Mr. Geary largely ignores the SEC's reasoning as to the factors he claims were mitigating.

He first notes that relevant disciplinary history is a principal consideration under the Sanctions Guidelines, which call for "progressively escalating sanctions on recidivists." Add. at 18; *see also id.* at 22. He complains that the SEC failed to assign mitigating weight to his lack of a disciplinary history. But the SEC correctly held that while disciplinary history is an *aggravating* factor, the absence of prior discipline is not mitigating. *See Rooms*, 444 F.3d at 1214; *see also* Add. at 22 & n.1 (noting "the presence of certain factors may be aggravating, but their absence does not draw an inference of mitigation, citing *Rooms*). This is so, as the SEC observed,

11

"because an associated person should not be rewarded for acting in accordance with his duties as a securities professional." Admin. R., Vol. 1 at 31 (internal quotation marks omitted).

Nor did the SEC ignore Mr. Geary's cooperation in FINRA's investigation. *See* Add. at 23 (listing as considerations "substantial assistance" in the investigation and the lack of delay tactics, concealed information, and inaccurate or misleading evidence). Rather, the SEC noted that nothing in the record indicated that Mr. Geary "took any steps beyond complying with FINRA's rules requiring him to cooperate with staff inquiries into issues that others had brought to FINRA's attention." *Id.* at 32. Thus, the SEC rejected his mitigation argument because "[he] had an unequivocal responsibility to fully cooperate with FINRA." *Id.* (internal quotation marks omitted). Neither his cooperation with FINRA's investigation nor his truthful testimony necessitated a lighter sanction. *See Rooms*, 444 F.3d at 1214-15.

Noting that timely acceptance of responsibility and corrective actions are also principal considerations under the Sanctions Guidelines, *see* Add. at 22, Mr. Geary describes his actions upon learning of GSI's net capital deficiency in February 2010, including his attempts to obtain a bank loan and his contribution of his own private funds to GSI. But he does not advance any argument why the SEC erred in declining to conclude these measures were mitigating factors. The SEC decided that his acknowledgement of responsibility was not mitigating because he continued to blame others for the violations, insisting "that he was largely uninvolved and therefore not responsible." Admin. R., Vol. 1 at 31. It found that Mr. Geary's response to the net

12

capital violations "indicates a disturbing approach to regulatory compliance and its role in protecting customers." *Id*. The SEC also gave no mitigating weight to his efforts to obtain additional capital in February 2010 because he nonetheless knowingly permitted GSI to continue its operations while it had a net capital deficiency. Moreover, the evidence showed that Mr. Frager had warned Mr. Geary in January 2010 about the imminent deficiency, but he failed to take any action until GSI had actually fallen out of compliance the following month. We see no abuse of discretion in the SEC's rejection of this mitigation argument.

Mr. Geary next contends that the SEC failed to consider that he had not engaged in "a pattern of misconduct . . . over an extended period of time." Add. at 22. But the SEC *found* a pattern of misconduct here. It pointed to the considerable size of GSI's net capital deficiency in May 2009, followed by the extended deficiency period in February 2010, emphasizing the short amount of time between these two deficiency periods. *See* Admin. R., Vol. 1 at 29; *see also id.* (noting Mr. Geary's "repeated failures to heed clear warnings"); *id.* at 31 (declining to characterize Mr. Geary's conduct as "aberrant" "given GSI's violations on multiple days, in successive years"). Mr. Geary cites nothing precluding the SEC from finding an extended pattern of misconduct based on the substantial evidence presented.

Contrary to his assertion, the SEC also did not ignore the lack of customer complaints against Mr. Geary since 2009. It held that "[h]is compliance during a limited period of heightened supervision does not provide any meaningful assurance

13

as to future violations, particularly when he continues to shift responsibility for the violations that occurred." *Id.* at 34. The SEC distinguished the case that Mr. Geary relies on in support of his contention, which involved facts not present here (an inexperienced respondent with a minor role in a larger scheme), suggesting that future violations were unlikely. Mr. Geary ignores the SEC's reasoning and fails to show it did not properly consider this factor.

He next argues that the SEC failed to consider that no customer suffered any financial loss, nor did he personally profit from his misconduct. *See* Add. at 22, 23. But the SEC did address these factors. It found the lack of customer losses not mitigating because Mr. Geary still subjected GSI's customers to undue risks by disregarding the net capital rule. He argues this is supposition and a clear disregard of the Sanctions Guidelines' focus on injury. But as we have observed, "the net capital rule is one of the most important weapons in the Commission's arsenal to protect investors." *Don D. Anderson & Co.*, 423 F.2d at 816 (internal quotation marks omitted); *see also Touche Ross & Co.*, 442 U.S. at 570 (noting the rule is meant to "protect customers from the risks involved in leaving their cash and securities with broker-dealers"). In light of the purpose of the rule, we cannot say that the SEC was required to reduce Mr. Geary's sanctions because no customer suffered a financial loss as a result of his misconduct. As to his lack of profit, the SEC held that the absence of this aggravating factor is not a mitigating factor. We see no abuse of discretion in the SEC's consideration of these factors.

14

Mr. Geary argues that the SEC effectively ignored that he had been sanctioned for the same misconduct by an Oklahoma agency. *See* Add. at 23. He claims that the SEC dismissed these prior sanctions as a mitigating factor solely because they were imposed through a settlement. Not so. The SEC held that the Oklahoma sanctions did not sufficiently remediate Mr. Geary's misconduct due to their limited geographic scope—reaching only Oklahoma—as compared to FINRA's nationwide jurisdiction.

Next, Mr. Geary cites nothing supporting his proposition that his conduct was not egregious because he did not act with intent. The SEC addressed and rejected his contention that a finding of egregious conduct requires fraud or a high level of scienter, holding that the Sanctions Guidelines do not require such a showing. We, too, have observed that the SEC "has never understood the term 'egregious' to require proof of intent, knowledge, or a breach of a fiduciary duty." *ACAP Fin.*, 783 F.3d at 766.

Finally, Mr. Geary argues that the SEC failed to properly consider the evidence of his inability to pay the fine imposed. He points to his own testimony about his family's financial circumstances. But the SEC held that FINRA is entitled to require documentation of a bona fide inability to pay, and Mr. Geary failed to document his income, assets, or expenses. The SEC's conclusion is consistent with the Sanctions Guidelines. *See* Add. at 21 ("The burden is on the respondent to raise the issue of inability to pay and to provide evidence thereof. . . . Adjudicators should require respondents who raise the issue . . . to document their financial status through

15

the use of standard documents that FINRA staff can provide[].”); *see also ACAP Fin.*, 783 F.3d at 768 (noting the SEC's rejection of a claim of inability to pay due to a lack of information about financial circumstances).

Mr. Geary fails to demonstrate that the SEC abused its discretion in rejecting any of his mitigation arguments.

### 3. The Sanctions Do Not Lack a Remedial Purpose

Mr. Geary contends that the SEC failed to articulate a remedial purpose for the sanctions imposed, which he claims are impermissibly punitive. But the SEC explained that the sanctions were necessary to protect investors. In holding that significant sanctions were warranted, the SEC noted Mr. Geary's "troubling attitude" regarding regulatory compliance, his display of "a disturbing lack of understanding and ignorance of FINRA rules," his repeated failure to heed warnings regarding protecting GSI's capital, and "concerns about his ability to comply with regulatory requirements generally." Admin. R., Vol. 1 at 29, 32, 33 (internal quotation marks omitted). Because Mr. Geary continues to work in the securities industry, the SEC decided that an all-capacities suspension was appropriate to impress on him the need to comply with regulatory requirements, rather than addressing violations after they occur. He has not demonstrated that the sanctions imposed lack a remedial purpose.[8]

FINRA imposed, and the SEC affirmed, sanctions that are within the ranges recommended by FINRA's Sanctions Guidelines. Because Mr. Geary fails to show

---

[8] Mr. Geary also baldly asserts that the sanctions "are clearly excessive." Aplt. Br. at 30. We decline to address this perfunctory contention.

that these sanctions are "beyond the law, unsupported factually, or completely lacking reasonableness," *ACAP Fin.*, 783 F.3d at 765 (brackets and internal quotation marks omitted), we will not impede the SEC's considerable discretion in determining the appropriate remedy for his violations.

## III.    CONCLUSION

The petition for review is denied.

Entered for the Court

Carolyn B. McHugh
Circuit Judge

17